CITY OF NEW HAVEN ET AL. *v.* PUBLIC UTILITIES COMMISSION ET AL.

SHAPIRO, LOISELLE, MACDONALD, RUBINOW and DANNEHY, Js.

Argued October 11, 1973—decided January 15, 1974

*George C. Hastings,* with whom were *Henry L. Fisher, James M. O'Connor* and *Peter B. Cooper,* and with whom, on the brief, were *Thomas F. Keyes,* corporation counsel, *S. Frank D'Ercole, Stephen Darley* and *Louise G. Trubek,* for the appellants (named plaintiff et al.).

*Frederick D. Neusner,* assistant attorney general, with whom were *Richard L. Barger,* assistant attorney general, and, on the brief, *Robert K. Killian,* attorney general, for the appellee (named defendant).

*John D. Fassett,* with whom, on the brief, was *Noel E. Hanf,* for the appellee (defendant The United Illuminating Company).

*Walter F. Torrance, Jr.,* for the appellee (defendant The Connecticut Light and Power Company).

SHAPIRO, J. This case involves an appeal from a judgment of the Court of Common Pleas based on its order modifying a supersedeas and on its dismissal of an appeal from a finding and order of the public utilities commission granting applications of The United Illuminating Company and The Connecticut Light and Power Company for approval of the construction of certain electrical transmission lines within the city of New Haven.

The material facts are as follows: On or about July 16, 1970, under the provisions of General Statutes § 16-243,[1] The United Illuminating Company,

---

[1] "[General Statutes] Sec. 16-243. JURISDICTION OF COMMISSION OVER ELECTRICITY TRANSMISSION LINES. The commission shall have exclusive jurisdiction and direction over the method of construction or reconstruction in whole or in part of each system used for the transmission of electricity, with the kind, quality and finish of all materials, wires, poles, conductors and fixtures to be used in the construction and operation thereof, and the method of their use, including all plants and apparatus used for generating electricity

hereinafter called UI, made application to the public utilities commission, hereinafter called the P.U.C., for approval of the construction of a two-circuit, three phase 115-KV overhead electrical transmission line as part of the New England interstate grids from the UI Grand Avenue substation in New Haven to a new substation to be constructed at the site of the former Connecticut Coke Company, south of Waterfront Street in New Haven. These high voltage lines were to be situated on nineteen poles varying between 93 and 180 feet in height. On or about July 16, 1970, The Connecticut Light and Power Company, hereinafter called CL&P, made application to the P.U.C. for approval of the construction of a 345-KV/115-KV overhead electrical transmission line which was to be constructed between Totoket Junction in the town of North Branford and UI's proposed substation at the Coke Works site on the east shore of the New Haven harbor as part of the New England interstate grid. These high voltage lines within the city of New Haven were to be situated on poles varying between 85 and 165 feet in height. The P.U.C. held public hearings with respect to these applications in Hartford on July 29, 1970, and in New Haven on September 23, 24 and 28, 1970. On December 1, 1971, the P.U.C. made and filed its finding and order approving the aforesaid applications, thereby permitting

located upon private property upon which there are conductors capable of transmitting electricity to other premises in such manner as to endanger any person or property. The commission may make any order necessary to the exercise of such power and direction, which order shall be in writing and entered in the records of the commission. Each person or corporation operating any such system or generating plant shall, at its expense, comply with such order. Any person violating any provision of any such order shall be subject to the penalty prescribed in section 16-41."

UI and CL&P to construct the high voltage over-head transmission lines within the territorial limits of New Haven, subject to P.U.C. approval of a plan for selective tree planting and cutting. The order also directed the defendants "to do all reasonably possible to diminish the effect upon the beauty and natural resources for general aesthetic and ecological considerations." The plaintiffs, pursuant to § 16-35,[2] appealed from this order to the Court of Common Pleas.[3] This appeal operated as a supersedeas of the P.U.C. order pursuant to § 16-39.[4] On February 16, 1972, UI and CL&P filed a motion for modification of the supersedeas which the court (*McGuinness, J.*) granted. Thereafter, the court (*Hanrahan, J.*) heard evidence on the issue of

---

[2] "[General Statutes] Sec. 16-35. APPEALS TO COURT OF COMMON PLEAS. Any company, town, city, borough, corporation or person aggrieved by any order, authorization or decision of the commission, except an order, authorization or decision of the commission approving the taking of land, in any matter to which he or it was or ought to have been made a party, may appeal therefrom to the court of common pleas within thirty days after the filing of such order, authorization or decision. The party so appealing shall give bond to the state, with sufficient surety, for the benefit of the adverse party, in such sum as the commission fixes, to pay all costs in case he or it fails to sustain such appeal."

[3] That portion of the order which relates to approval of the Black Pond Junction to East Meriden substation in Meriden and the East Meriden substation, Meriden to Carpenter Lane, Wallingford is not involved in this appeal.

[4] "[General Statutes] Sec. 16-39. SUPERSEDEAS. Each such appeal shall be a supersedeas of the order, authorization or decision appealed from, provided the court to which any such appeal is brought, or, if such court is not in session, any judge of the court of common pleas may, at any time, order that such appeal shall not so operate if, in the opinion of such court or judge, the appeal is brought for purposes of delay or if justice or equity or public safety or expediency so requires; or such court or judge may order that such appeal shall so operate only upon compliance by the parties, or any of them, with such terms or conditions as such court or judge may determine."

aggrievement and reviewed the certified record of the proceedings of the P.U.C. From a judgment dismissing the appeal, the plaintiffs have appealed to this court.

I

We first consider the motion for modification of the supersedeas. The plaintiffs have assigned error in the court's refusal to find certain facts recited in their draft finding on the claim that they were admitted or undisputed. They have also assigned error in several paragraphs of the court's finding. Neither assignment of errors has been briefed and therefore they must be treated as abandoned. *Jones Destruction, Inc.* v. *Upjohn,* 161 Conn. 191, 193, 286 A.2d 308; Maltbie, Conn. App. Proc. § 327.

The court found the following facts: On December 1, 1971, the P.U.C. entered an order on the application of UI and CL&P, and on December 28, 1971, pursuant to § 16-35, an appeal was taken from that order. The appeal seeks review of the order only insofar as it authorizes construction of transmission lines within the city of New Haven. UI and CL&P, on February 16, 1972, filed a motion for modification of the supersedeas which followed as a result of the filing of the appeal pursuant to § 16-39. The modification was requested by motion dated February 16, 1972, so as to permit commencement prior to April 1, 1972, of construction of foundations for the towers to be located in New Haven which were included in the construction authorized by the P.U.C. After a hearing, the court on March 14, 1972, granted the motion and specifically authorized UI to construct three foundations with anchor bolts on property owned by it at English station in New Haven and CL&P to construct

nine foundations with anchor bolts within its right-of-way in New Haven. Absent the granting of such order modifying the supersedeas, the plaintiffs, by filing their appeal, would have prevented the commencement of construction prior to April 1, 1972. If the court had denied the motion, the effect would have been to declare all of the prior proceedings a nullity. The original application to the P.U.C. was made in July, 1970, and it held extensive public hearings prior to rendering its order on December 1, 1971. To require UI and CL&P to proceed with another application under Public Act No. 575 of the 1971 session of the General Assembly[5] (now General Statutes §§ 16-50g—16-50w) with additional public hearings covering the same subject matter with the same opposition, followed by the appellate procedure provided therein, would place an undue burden on all the parties and result in an undue delay.

From the foregoing facts, the court concluded that §§ 16-50g—16-50w are not applicable to the facilities in question; that justice, equity, public safety and expediency required that the order of March 14, 1972, modifying the supersedeas be entered; and that such an order was required to prevent the plaintiffs, by the mere filing of their appeal, from delaying construction of the facilities beyond April 1, 1972, and thereby requiring further proceedings with respect to such facilities pursuant to §§ 16-50g—16-50w.

---

[5] Public Act No. 575 of the 1971 session of the General Assembly is now known as the Public Utility Environmental Standards Act and is chapter 277a of the General Statutes. Its effective date is July 1, 1971, but § 16-50k (d) provides that "[t]his chapter shall apply to any facility the construction of which is commenced on or after April 1, 1972 . . . ."

The plaintiffs make the claim that modification of the supersedeas was for the purpose of avoiding applicability of Public Act No. 575; that Public Act No. 575 may not be construed so as specifically to exempt the transmission lines in controversy from complying with its provisions; that the legislative history of the act indicates that the exemption for facilities under construction prior to April 1, 1972, was included only for the purpose of allowing the Power Facility Evaluation Council (established by § 16-50j) time to become administratively organized before accepting and acting upon applications; and that considerations concerning the location and method of construction of the transmission lines in controversy by the Power Facility Evaluation Council were properly within the scope of the act.

We are at once confronted by the question of applicability of Public Act No. 575, now chapter 277a of the General Statutes, as it may relate to the contemplated transmission lines. The language of § 16-50k (d) is explicit in stating: "This chapter [277a] shall apply to any facility the construction of which is *commenced* on or after April 1, 1972 . . . ." (Emphasis added.) This language is to be construed according to commonly approved usage. General Statutes § 1-1. The word commence is defined to mean "to begin; to enter upon; start; to initiate formally by performing the first act; to have a beginning." Webster, Third New International Dictionary. Applying this usage to the present situation, we must conclude that § 16-50k (d) does provide a period of protection when, as in the present case, construction had commenced before April 1, 1972.

Our construction of the statute is fortified by its legislative history. The plaintiffs argue in their brief that the legislative record makes clear that the date of April 1, 1972, was inserted in Public Act No. 575 for administrative convenience only and not for the purpose of permitting construction to be commenced prior to April 1, 1972. During discussion of this bill on May 28, 1971, in the House of Representatives, one member stated: "The effective date is now July 1, '71, for the promulgation of rules, but the commencement of the actual working side of the Bill . . . which will affect the utility companies, will be April 1, 1972." Another member stated: "The reason for the two effective dates . . . the one of July 1st and the other of April 1st . . . is on the one hand to give the Council [Power Facility Evaluation Council] time to come into action, to get appointed, to adopt its regulations, set up its mechanics, and then hopefully by April 1st of next year they will have done all that and can begin to accept applications." 14 H.R. Proc., Pt. 9, 1971 Sess., pp. 4020, 4022. Thus, contrary to the plaintiffs' claim, the language of Public Act No. 575 indicates that it does not affect construction commenced prior to April 1, 1972. We may take judicial notice of the discussion on the floor of the General Assembly. *Harris* v. *Planning Commission,* 151 Conn. 95, 100, 193 A.2d 499.

The appendix to the UI and CL&P brief discloses that at the hearing on the motion for modification of the supersedeas, there was testimony given by the UI manager of engineering in behalf of both UI and CL&P. He stated that the total electric generating capacity consisted of a maximum capacity of 163,000 kilowatts at the English station,

400,000 kilowatts from two transmission lines along the main line tracks of the Penn Central railroad extending into the New Haven area from Bridgeport and 170,000 kilowatts from a transmission line extending into the New Haven area; that the peak load for the New Haven area during 1971 was 383,000 kilowatts and he estimated that the peak would be 405,000 kilowatts in 1972, 438,000 kilowatts in 1973, 480,000 kilowatts in 1974 and 525,000 kilowatts in 1975. He further testified that reasonable assurance of reliable electric service to their customers requires that their bulk power facilities be able to withstand the simultaneous outage of both transmission lines extending along the railroad; that a train wreck or any other occurrence along the ten-mile section of the railroad between the Devon generating plant of CL&P and UI's West River substation in New Haven which knocked down the catenary structures supporting these lines would almost certainly disrupt both lines and terminate the flow of this electrical energy to the New Haven area. He estimated that without the transmission lines along the railroad, the remaining supply of electrical energy in the New Haven area would have been insufficient to accommodate consumers' peak loads on approximately sixty-five days during 1971, and predicted that such an outage would create a shortage on 140 days in 1972, 220 days in 1973, and 255 days in 1974.

This witness also indicated that while elimination of the consequences of an outage of the transmission lines along the railroad is the most critical aspect of UI's and CL&P's concern about further delay in the construction of the facilities in question, it is not their only concern. The proposed facilities which will initially provide the New Haven

area with a source of 500,000 kilowatts of capacity through the interconnection with the 345-KV New England transmission grid, not only will eliminate the consequences of an outage of the railroad lines but also will permit the maintenance of adequate voltage supply levels in the New Haven area during periods of high customer electric usage. This problem, which will become more critical as loads grow, would be solved by the interconnection with the 345-KV grid. Another, and an increasingly significant, aspect of concern about delay in these facilities is the fact that such facilities are crucial to the new Coke Works generating unit presently under construction on New Haven harbor. Delivery of the power from such unit to the New Haven area and to the New England grid will require the completion of these facilities, and a further delay of a year or more in such completion could put the entire Coke Works project in jeopardy. In order to minimize further delay, UI, immediately upon receipt of the P.U.C. order, arranged for a contractor to commence construction of the portion of the facilities from Totoket Junction to the Coke Works site. UI also filed applications for additional permits required for the river crossing of the Coke Works to the Grand Avenue line and was preparing to commence construction of that portion of that line which does not require further permits. Each delay in the availability of these critically needed facilities extends and increases the hazard to the reliability of the electric supply to the New Haven area.

The court had an opportunity to consider this testimony in determining whether the requirements of § 16-39 had been met. From the evidence before it, the court found that the supersedeas was

requested to permit the commencement of construction prior to April 1, 1972, and that absent the granting of such an order such construction would have been prevented before that date. It concluded that justice, equity, public safety and expediency required that the supersedeas be modified. Judicial discretion is always a legal discretion, exercised according to the recognized principles of equity. *Hammerberg* v. *Leinert,* 132 Conn. 596, 604, 46 A.2d 420. We cannot say that the court abused its discretion in modifying the supersedeas.

## II

Following the taking of evidence on the issue of aggrievement, the court found that the city of New Haven is an aggrieved party for the purpose of taking this appeal and that the remaining plaintiffs are not aggrieved parties. The appeal of the plaintiffs, other than the city of New Haven, from the orders of the P.U.C. was dismissed and the issues found for the defendants. From the judgment rendered thereon, those plaintiffs appealed.

We first discuss the issue of aggrievement. In their appeal to the Court of Common Pleas, the plaintiffs, other than the city of New Haven, claimed to be aggrieved by the order of the P.U.C. in the following manner: The New Haven Redevelopment Agency, in that the contemplated transmission lines will affect the Fair Haven Renewal and Redevelopment Project by adversely affecting the property rights and quiet enjoyment of the residents of that area; Catherine Quinn, in that the transmission lines will adversely affect her property rights and because such lines and towers will adversely affect the public trust in the natural resources of the city of New Haven; the Fair Haven Betterment Associa-

tion, Inc., and the Fair Haven Project Area Committee, Inc., in that the transmission lines and towers will adversely affect the future development of their project area and will injure the public trust in the state's natural resources, particularly as to the city's development of residential areas, parks and open spaces; the East Rock Neighborhood Association, Inc., in that the transmission lines will adversely affect the public trust in the city's natural resources and assets particularly as to its parks, open space assets and residential areas. These claims were denied by the defendants in their respective answers.

The appendix to the plaintiffs' brief discloses that the director of the city of New Haven planning department was called as a witness in the court hearing on aggrievement and testified as to the damaging effect the transmission lines would have on development, open spaces, parks and recreational programs in certain neighborhood areas within the city of New Haven; and one other plaintiff testified that the transmission towers would be visible from her property and would affect its value. The court found that the city of New Haven, as a municipal body, has a substantial interest in the matter of construction of facilities by public service companies within its corporate limits. The court concluded that the city of New Haven is an aggrieved party within the meaning of § 16-35 with respect to that portion of the P.U.C. order involved in the appeal and that the remaining plaintiffs are not aggrieved parties within the meaning of that statute. The plaintiffs, other than the city of New Haven, have assigned error as to those conclusions which must stand unless they are legally or logically inconsistent with the facts found or unless they involve the

application of some erroneous rule of law material to the case. *Sea Beach Assn., Inc.* v. *Water Resources Commission,* 164 Conn. 90, 93, 318 A.2d 115.

The claims of aggrievement made by these plaintiffs presented an issue of fact for the determination of the trial court. *Hickey* v. *New London,* 153 Conn. 35, 38, 213 A.2d 308. The burden of proving that they were aggrieved was on these plaintiffs. *London* v. *Planning & Zoning Commission,* 149 Conn. 282, 284, 179 A.2d 614. The court must decide if these plaintiffs sustained that burden. *Tyler* v. *Board of Zoning Appeals,* 145 Conn. 655, 662, 145 A.2d 832. Aggrievement requires a showing that the plaintiffs have a specific, personal and legal interest in the subject matter as distinquished from a general interest such as is the concern of the community as a whole. *Sheridan* v. *Planning Board,* 159 Conn. 1, 13, 266 A.2d 396. To be aggrieved within the meaning of § 16-35 requires that property rights be adversely affected by any "order, authorization or decision" of the commission. *Kram* v. *Public Utilities Commission,* 126 Conn. 543, 548, 12 A.2d 775; *Norton* v. *Shoreline Electric Ry. Co.,* 84 Conn. 24, 33, 78 A. 587; see *Sea Beach Assn., Inc.* v. *Water Resources Commission,* supra. The court was not required to be persuaded by this testimony on aggrievement since none of this evidence required a finding that any property or legal rights of these plaintiffs would be adversely affected.

The plaintiffs rely on *Scenic Hudson Preservation Conference* v. *Federal Power Commission,* 354 F.2d 608 (2d Cir.), as support for their claim that they are aggrieved parties in the present case. In that case, conservation groups were held to have

standing to challenge their exclusion from effective participation in hearings before the federal power commission. The court stated (p. 616): "In order to insure that the Federal Power Commission will adequately protect the public interest in the aesthetic, conservational, and recreational aspects of power development, those who by their activities and conduct have exhibited a special interest in such areas, must be held to be included in the class of 'aggrieved' parties under § 313 (b) [16 U.S.C. § 852 (b)]. *We hold that the Federal Power Act gives petitioners a legal right to protect their special interests.*" (Emphasis added.) The plaintiffs assert that this court should apply the *Scenic Hudson* rationale to the present case and hold that the redevelopment agency and the neighborhood groups are also aggrieved solely because they have exhibited a special interest in aesthetic, conservational and recreational aspects of the New Haven area. The plaintiffs' reliance on *Scenic Hudson* is misplaced, and their assertion unsupportable.

The question presented in the present case is whether the order entered by the P.U.C. caused plaintiffs to be "aggrieved" within the meaning of § 16-35 of the General Statutes. It is a matter to be resolved solely on the basis of Connecticut law. Federal law is without relevance in this instance.

*Scenic Hudson,* supra, 613, on the other hand, involved the proper interpretation of the Federal Power Act. 16 U.S.C. § 791a et seq. Standing there was based on the express inclusion of "recreational purposes" among the beneficial public uses to which the Federal Power Act applied and a clearly discernable legislative intent. "'Recreational pur-

poses' are expressly included among the beneficial public uses to which the statute [§ 10a of the Federal Power Act, 16 U.S.C. § 803a] refers. The phrase undoubtedly encompasses the conservation of natural resources, the maintenance of natural beauty, and the preservation of historic sites." *Scenic Hudson, supra,* 614.

Section 16-35 of the General Statutes makes no reference to the aesthetic, conservational or recreational aspects of power development; and its legislative history furnishes no indication that the legislature intended to base standing on these matters. The plaintiffs' invitation to apply federal precedent to the issue of aggrievement is thus rejected.

At any rate, the plaintiffs have failed to cite the most relevant federal authorities. It is now settled that standing to maintain an action in the federal courts requires proof of "injury in fact" to an interest within the "zone of interests" sought to be protected by the federal statute in question. *Data Processing Service* v. *Camp,* 397 U.S. 150, 152–53, 90 S. Ct. 827, 25 L. Ed. 2d 184. Standing is not confined to those who can show economic harm; a plaintiff must allege that he has been or will in fact be harmed by the challenged agency action. *United States* v. *SCRAP,* 412 U.S. 669, 686, 93 S. Ct. 2405, 37 L. Ed. 2d 254; *Sierra Club* v. *Morton,* 405 U.S. 727, 734, 92 S. Ct. 1361, 31 L. Ed. 2d 636. In *Sierra Club* the court explained: "It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review. See e.g., *NAACP* v. *Button,* 371 U.S. 415, 428 [83 S. Ct. 328, 9 L. Ed. 2d 405]. But a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organi-

zation is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA. The Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations. But if a 'special interest' in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization, however small or short-lived. And if any group with a bona fide 'special interest' could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so." *Sierra Club,* supra, 739.

More significant than the inapplicability of the case on which the plaintiffs rely, however, is the fact that the issue of aggrievement is not a federal issue, but a requirement of Connecticut law. It has long been established that aggrievement in Connecticut requires "a specific, personal and legal interest in the subject matter of the decision as distinguished from a general interest." See *I. R. Stich Associates, Inc.* v. *Town Council,* 155 Conn. 1, 3, 229 A.2d 545; *Sheridan* v. *Planning Board,* 159 Conn. 1, 13, 266 A.2d 396.

Finally, we briefly discuss the plaintiffs' claim that in finding that the city of New Haven was the only party aggrieved, the remaining plaintiffs were "deprived of active participation and presentation of their arguments by counsel of their choice." They indicate that they have "assigned error to the court's finding on aggrievement because the issue

is considered important as a matter of precedent in future litigation and because all the plaintiffs wish to emphasize that they have an important interest and stake in the determination of the substantive merits of this appeal." This claim falls short of a showing of harmful error. All plaintiffs participated in the proceedings before the P.U.C. and filed pleadings in the proceedings in the trial court. All plaintiffs combined to file the joint brief received by this court. Thus, the conclusion of the court that only the city of New Haven is an aggrieved party cannot be said to have inhibited either the preparation or presentation of the arguments of the other plaintiffs.

As to the concern of the plaintiffs with precedent for future litigation, it is sufficient to note that "no person is entitled to set the machinery of the courts into operation unless for the purpose of obtaining redress for an injury he has suffered or to prevent an injury he may suffer, either in an individual or representative capacity." *Waterbury Trust Co.* v. *Porter,* 130 Conn. 494, 498, 35 A.2d 837. This principle applies with equal force to the claim made by the plaintiffs in the present matter.

Under § 16-35, aggrievement is a prerequisite to a right of appeal. The court acted within its discretion on an issue of fact in concluding that the city of New Haven is an aggrieved party and that the remaining plaintiffs are not aggrieved parties within the meaning of the statute. We cannot say that in reaching this conclusion the court abused its discretion. Accordingly, these plaintiffs have no standing to appeal from the decree and order of the P.U.C.

## III

The claim is made that the court erred in concluding that the decision of the P.U.C. was not illegal, arbitrary, unreasonable and in abuse of its discretion.

The jurisdiction of the court over this appeal is derived from § 16-35. "Under § 16-37,[6] the court reviews, on a certified record, the proceedings of the commission, examines the legality of the order, authorization or decision appealed from and its propriety and expediency so far as the court has cognizance of the subject, and proceeds in the same manner as on complaints for equitable relief. The court cannot substitute its discretion for that legally vested in the commission but determines on the record whether there is a logical and rational basis for the decision of the commission or whether, in the light of the evidence, it has acted illegally or in abuse of its discretion. A plaintiff has the burden of proof as to the existence of any abuse. General Statutes § 16-37; *Briggs* v. *Public Utilities Commission,* 148 Conn. 678, 687, 174 A.2d 529." *Anthony Augliera, Inc.* v. *Loughlin,* 149 Conn. 478, 481, 181 A.2d 596. A finding by the commission should state with clarity and completeness the facts and conclusions essential to its decision, so that the trial court and this court can determine from the record of the commission whether the facts furnished justifiable reason for its action. *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 252, 140 A.2d 874.

We turn now to consideration of the finding and order of the P.U.C. and the court's ruling thereon.

---

[6] Section 16-37 of the General Statutes is entitled "Procedure on appeal."

The evidence before the P.U.C. with regard to this finding and order is as follows: The manager of engineering for UI, a graduate electrical engineer, testified that the electrical needs of the New Haven area cannot be supplied reliably without construction of the proposed transmission lines; that applications for approval have been filed with the corps of engineers, the Connecticut water resources commission and the board of harbor commissioners of New Haven, but such applications have not yet been heard; that consideration was given to the possibility of constructing only the water crossing part of the transmission lines underwater; that if a fault occurs on an underground cable as compared to an overhead line it is likely to be more serious and the whole underwater cable might have to be abandoned; that an underground cable is much more susceptible to sabotage or illegal acts because it takes considerably longer and is more difficult to repair than an overhead line. The vice-president for electrical engineering for CL&P, a graduate electrical engineer, testified that the right-of-way from the site of the former Connecticut Coke Works Company, herein referred to as the Coke Works, to Totoket Junction will provide the principal means of supplying additional power to New Haven upon completion of the transmission lines and will also provide the principal connection between the site and the New England transmission grid, and that the cost of the overhead construction would be about $1,454,000. The president of UI testified that in designing its proposed facilities UI considered four basic obligations to the public it serves: to supply an adequate amount of power to meet its needs, to insure that power supply conforms to proper standards of reliability, to be sure that the facilities

have as limited an adverse impact on the environment as reasonably can be accomplished, and to see that power costs to the public are kept, if possible, at a price the public can afford to pay. He testified further that the proposed lines are designed to eliminate the existing risk of growing vulnerability of the New Haven area to the hazard of interruption of the transmission lines that run along the railroad; that the lines have a longer term significance as a route of getting power from the Coke Works unit planned for operation in 1975 to New Haven and to the New England transmission grid; that the difference in cost between overhead and underground construction of the Totoket Junction to the Coke Works and the Coke Works to the Grand Avenue lines as shown in exhibit 25,[7] is conservatively $15,350,000; that if the additional cost of underground construction were spread among all UI customers it would involve an annual increase of $4.87 per average customer in the entire franchised area, not just for those customers in the New Haven area. A real estate engineer for CL&P testified that there is no real difference in selling price between houses that are adjacent to the right-of-way and those that are removed from the right-of-way.

Various witnesses testified in opposition to the overhead transmission line construction. Testimony was given that the overhead facilities

[7] Exhibit 25, entitled "Comparison of Transmission Line Estimated Costs 1971-1980 UI Service Area" estimates the cost of installing the 115-KV line between the Coke Works and Grand Avenue as $1,400,000 for overhead installation and $4,200,000 for underground installation. The same exhibit estimates the cost of installing the 115-KV and 345-KV line between Totoket Junction and the Coke Works as $1,450,000 overhead and $14,000,000 underground.

threatened to blight New Haven's harbor area; that they would obscure the scenic view of many motorists and residents; that several city parks would be adversely affected by the proposed lines; that the development of the Castle property, as a park, would be impeded; that the overhead lines would eliminate the possibility of eventual reclamation of the Mill River for sports such as boating, bathing and fishing; that the lines would deny the entire Fair Haven neighborhood of a residential character; and that property near high voltage transmission lines would depreciate in value by reason of those lines.

Opposition focused on the proposed line from Totoket Junction to the Coke Works consisting of double circuit, ornamental steel pole structures carrying one 345-KV circuit and one 115-KV circuit for which substantially all of the necessary rights-of-way had been acquired. The P.U.C. analysis noted that the greater portion of this line does not cross any highway and is remote from residential areas; that as the line approaches the Coke Works, a distance of somewhat less than a mile, it runs through an industrial area consisting primarily of oil and gas storage facilities; that for a distance of approximately two miles from North High Street to the Castle property the proposed line would cross a few roadways and then extend behind a drive-in theater, a shopping center and a swampy area; that the Castle property is presently owned by the Rocky River Realty Company, a subsidiary of Northeast Utilities of which CL&P is also a subsidiary; that the difference in cost between an underground and an overhead transmission system would be $15,346,000 and would have an impact on the rates; that any suggestion that only lines

in the New Haven area be underground, at the expense of consumers all over the state, is untenable; that the preponderance of evidence before it shows that the current state of the technology of power transmission is such that the overhead conductors transmitting the loads contemplated by the applications are more likely to be reliable and free of operational difficulty than an underground and underwater system carrying the same load; that the proposed construction provides for minimizing the impact on the aesthetics of the affected areas through selective tree trimming and the use of ornamental steel poles with upswept arms painted a neutral blue-gray.

The P.U.C. made two tours of the proposed site and noted that in the area east of Waterfront Street, the proposed construction would require some crossings of streets in the vicinity of North High Street; that to place this section underground would involve building structures at either end comprising switching and lightning protection facilities, which in itself would be objectionable aesthetically; that the reliability of service would undoubtedly suffer from the additional time required to locate and correct faults in an underground installation; and that the portion of the line west of Waterfront Street to the Coke Works site is located in a predominantly industrial area.

Continuing its analysis, the P.U.C. stated that it had reviewed conflicting testimony and concluded that the value of properties adjacent to existing high voltage transmission lines would not be substantially affected by the proposed construction; that this case requires the balancing of two great public interests: the one to assure adequate and

reliable supply of electrical energy at reasonable rates for the present and foreseeable future, and the other to preserve natural resources and to protect the environment. The P.U.C. concluded that the public interest in this particular case at this time requires the installation of these transmission lines through overhead construction.

The P.U.C. made a "finding of facts" as follows: "(1) The construction of the transmission lines which are the subject of these applications would constitute a portion of the plant of the applicants. The construction is found to be necessary in order for these utilities to keep abreast of the growing regional demand for electric power. The construction is essential to projected plans of the applicants and to their affiliates in order to provide a reliable and adequate supply of electric energy to customers within the area affected, to Connecticut industry, and to the public at large, and to participate in the New England power pool in accordance with their commitments for exchange of electricity. (2) The method of construction proposed in the plans and specifications of the applicants, as filed, conforms to Commission requirements of Docket No. 9000[8] and the National Electrical Safety Code[9] as to the

[8] Section 16-11-137 of the Regulations of Connecticut State Agencies (originally adopted as part of P.U.C. Docket No. 9000, effective July 30, 1968) provides that no electric line of a nominal phase to ground voltage exceeding twenty thousand volts shall be constructed without prior commission approval of a prescribed petition indicating the manner and method of construction.

[9] The P.U.C. recognizes the provisions of the National Electrical Safety Code and the National Electrical Code in effect from time to time as minimum requirements and recommends them as a guide to good practice for the installation, maintenance and operation of electrical facilities in all cases not governed by specific commission orders and provisions of the codes. Regs. Conn. State Agencies § 16-11-134.

method and manner of construction and safety of the public and employees of the applicant. The use of modern streamlined pole structure with upswept arms is a noticeable aesthetic improvement over older types of construction. (3) The cost of underground and underwater installation would be many times the cost of overhead installation and would have a marked unfavorable impact on rates charged the consumers. (4) Today's status of the technological art in underwater crossings in a voltage range of 115,000 volts or 345,000 volts does not assure a favorable operation with respect to maintenance and to repair time arising out of either total or partial failure of continuity of service and such underwater construction method would be likely to result in lower overall reliability of service. (5) The proposed line routing for this proposed construction has been selected with due consideration to the minimum interference with present land uses and favored environmental factors. (6) At the point where the proposed 115 KV line crosses the confluence of the Mill and Quinnipiac Rivers, running adjacent to the Connecticut Turnpike bridge along Interstate Highway No. 95, an overhead line installation will provide no substantial aesthetic detriment to automotive users of this bridge. (7) On the basis of the evidence, the applicants are found to be mindful of landscape aesthetics and will save trees and foliage wherever possible during construction; and they will otherwise attempt to preserve the present aesthetic values of the property on which the ornamental poles and lines will be installed. (8) The use of overhead high voltage transmission lines is, and for the foreseeable future will continue to be, a common necessity, throughout the country as well as in the State of Connecticut.

(9) The factors of overall costs and service reliability and their effect on the ratepayers and the public welfare clearly favor the overhead river crossing and overland construction."

The commission issued the following "order": *"It appearing that* the United Illuminating Company proposes to construct a two circuit 115 KV transmission line in New Haven and the Connecticut Light and Power Company to construct portions of a 345/115 KV line in the towns of Meriden, Wallingford, Branford, East Haven, New Haven, and North Branford, and *It appearing further that* the matter has been the subject of investigation and public hearing, and the Commission has made its findings of fact thereon, and *It appearing further that* the Commission has found that public convenience and necessity require the construction of these facilities, and *It appearing further,* with considerations of reliability of service and cost, that such facilities should be constructed substantially where proposed, and overhead rather than underground and underwater, *Now, therefore, it is ordered that* the applications of the United Illuminating Company and the Connecticut Light and Power Company should be and hereby are approved. The applicants are directed to do all reasonably possible to diminish the effect upon the beauty and natural resources for general aesthetic and ecological considerations. The applicants are directed to do such selective tree planting and cutting as will minimize damage to the natural environmental qualities of the area to be affected. Subject to necessary permission and approval by public authorities having jurisdiction, the applicant, the United Illuminating Company, is further directed, to the extent deemed feasible by

the Commission, to plan and install a line of trees and/or shrubs along the western sides of Quinnipiac Park to screen and shield from view that section of line running parallel to the park area as the proposed line crosses the confluence of the Quinnipiac and Mill Rivers. The applicants are further directed to submit for the approval of the Commission a plan for the selective tree planting and cutting above ordered and for the installation of trees and shrubs at Quinnipiac Park before proceeding with any of the work of clearing and construction pursuant to the approval hereby granted."

The trial court reviewed the proceedings of the P.U.C. on the certified record and examined the legality of the P.U.C.'s decision and order authorizing construction of the transmission lines. In so doing, the court under § 16-37, considered the propriety and expediency of the decision and order and arrived at its conclusion in the same manner as on complaints for equitable relief. The P.U.C.'s finding and order were legal and reasonable. They were consistent with and supported by the evidence in the record. The P.U.C. was not arbitrary and did not abuse its discretion. The court was correct in so finding.

## IV

We now discuss the claim of the city of New Haven, referred to as the plaintiff, that the P.U.C.'s findings are not supported by the evidence in the record. In order to follow the claims as made by the plaintiff in its brief we will list them seriatim and discuss them in that order. It contends in part A of its claim that the record does not support the P.U.C.'s analysis that it would cost $15,346,000 more

to install complete underground transmission lines than complete overhead transmission lines and that this would have a marked impact on rates; in B the claim is made that the finding with respect to greater reliability of an overhead transmission line as compared to an underground and underwater system carrying the same power loads is not supported by the record; in C it is claimed that the record fails to support the P.U.C.'s findings with respect to the effect of the proposed overhead lines upon environmental, recreational and aesthetic values; in D the claim is made that the P.U.C.'s finding with respect to the continued necessity of overhead lines is not supported by the record and is contrary to law; in E the claim is that the conclusion of the P.U.C. regarding the impact on property values because of the proposed overhead lines is not supported by the record; in F it is claimed that the P.U.C. arbitrarily and capriciously refused to ascribe any weight to evidence that the towers and overhead transmission lines would have an adverse effect on New Haven's master and redevelopment plans; in G it is contended that the P.U.C. arbitrarily and capriciously refused to ascribe any weight to evidence that New Haven would suffer damage with respect to recreational use of open space; in H it is claimed that the P.U.C.'s finding that the public welfare clearly favors overhead river crossing and overland construction is unsupported by subordinate facts; and in I it is claimed that the P.U.C. acted contrary to law in authorizing UI to construct its overhead transmission line over the tidal waters of New Haven harbor, namely, the confluence of the Quinnipiac and Mill rivers.

### (Claim A)

As already recited, there was testimony before the P.U.C. from which it could reasonably find as a fact that the underground installation would cost $15,350,000 more than overhead installation and that that additional cost, considering taxes, depreciation and increased operation and maintenance expenses as well as capital cost, would necessitate approximately $3,000,000 of additional revenues per year from UI customers and that that amount, spread among all UI customers, would mean about forty cents per month increase in bills of the average UI residential customer. An examination of the appendix to the plaintiff's brief discloses no evidence to contradict this finding and even if it did, the weight of the evidence, as well as matters of credibility, are within the province of the P.U.C. *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 264, 140 A.2d 874.

### (Claim B)

In addition to testimony from the defendants' witnesses, the P.U.C. also had before it a document entitled "Underground Power Transmission, A Report to the Federal Power Commission by the Commission's Advisory Committee on Underground Transmission." Excerpts from this engineering report, as appear in the appendix to the brief of the defendants UI and CL&P, disclose further support with respect to the finding of greater reliability of overhead transmission lines. There was also placed in evidence before the P.U.C. a reprint from the March, 1970, publication of the Institute of Electrical and Electronic Engineers entitled "Underground Transmission in the United States." Excerpts from

that report, as appear in the UI and CL&P appendix, support the finding of greater reliability in the use of overhead transmission lines. While the plaintiff disputes this evidence, the weight to which it is entitled was within the province of the P.U.C.

### (Claim C)

The plaintiff contends that the record fails to support the P.U.C.'s findings with respect to the effect of the proposed overhead lines upon environmental, recreational and aesthetic values. We have reviewed these contested findings and conclude that even if found to be unsupported by the record their deletion would not have a material effect on the result in this case. The jurisdiction of the P.U.C. is derived from the powers conferred by § 16-243 of the General Statutes. That section confers on the P.U.C. exclusive jurisdiction over "technical matters such as the quality and finish of the materials, wires, poles, conductors, fixtures and the method of their use." *Hartford Electric Light Co.* v. *Water Resources Commission,* 162 Conn. 89, 94, 291 A.2d 721. This section does not expressly or by implication require the commission to consider the environmental, recreational or aesthetic impact of its findings and order. On the other hand, the findings of the P.U.C., essential to the validity of its order, have ample support in the evidence. Accordingly, any error in the findings with respect to the effect of the proposed overhead lines upon environmental, recreational and aesthetic values was harmless error.

### (Claim D)

The P.U.C. found that "[t]he use of overhead voltage transmission lines is, and for the foreseeable future will continue to be, a common necessity throughout the country as well as in the State of

Connecticut." The plaintiff attacks this finding as unsupported by the record and contrary to law. We have reviewed the record and conclude that the statement is, indeed, unsupported by the record and must be stricken. *Grodzicki* v. *Grodzicki,* 154 Conn. 456, 460, 226 A.2d 656. Striking this finding, however, does not affect the result. In the remaining portions of its finding, the P.U.C. found that the cost of underground and underwater installation would have a marked unfavorable impact on the rates charged to consumers and that underwater construction would be likely to result in lower overall reliability of service. Also contained was a finding that the factors of overall costs and service reliability clearly favor the overhead river crossing and overland construction. Thus, these remaining portions furnish full support for the order of the P.U.C. Only fundamental and substantial errors which may do a litigant injustice can or ought to furnish grounds for disturbing a judgment rendered in substantial accord with principles of law. *Harry* v. *Bidwell,* 149 Conn. 93, 99, 175 A.2d 704. We find no error with regard to this claim.

### (Claim E)

The plaintiff seeks to attack the conclusion of the P.U.C. regarding the impact of the proposed overhead lines on property values. As this claim does not appear in the amended appeal or the assignment of errors, it is improperly before us and will not be considered. "This court shall not be bound to consider any errors on an appeal unless they are specifically assigned and unless it appears on the record that the question was distinctly raised at the trial and was ruled on and decided by the court adversely to the appellant's claim or that it

arose subsequent to the trial." *Weyls* v. *Zoning Board of Appeals,* 161 Conn. 516, 521, 290 A.2d 350.

### (Claim F)

The plaintiff contends that the P.U.C. was arbitrary in its view of the evidence as affecting the master plan of the city of New Haven and on the Fair Haven Renewal and Redevelopment Plan claiming that the transmission lines will have an adverse effect on redevelopment. Here, the P.U.C. was faced with a difference of opinion. The plaintiff's witnesses supported the claim that the overhead lines will have an adverse effect on redevelopment. There was evidence, however, before the P.U.C. to refute this claim. That the commission considered all of the evidence before it is apparent in its analysis when it stated: "This case requires the balancing of two great public interests, the one to assure adequate and reliable supply of electrical energy at reasonable rates for the present and foreseeable future, and the other to preserve natural resources and to protect the environment. The Commission concludes that the public interest in this particular case at this time requires the installation of these transmission lines through overhead construction." "It is sufficient if the finding and conclusions of the commission which it calls its 'docket' set forth the basic facts upon which it predicates its decision, so that the court can determine the basis of the commission's action." *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 252, 140 A.2d 874.

### (Claim G)

The plaintiff claims that the P.U.C. arbitrarily and capriciously refused to ascribe any weight to

the evidence that the city of New Haven would suffer damage with respect to the recreational use of its open space owing to the overhead transmission lines. As to this aspect of the hearing before the P.U.C., testimony was offered to show the effect the transmission lines would have regarding recreational use of the Quinnipiac River and Waterside Park, the development of New Haven harbor, the development of the Quinnipiac and Mill rivers and recreational uses of the Castle property and Peat Meadow Park. The P.U.C. gave consideration to these claims in its finding that the Castle property is presently owned by the Rocky River Realty Company, a subsidiary of Northeast Utilities of which CL&P is also a subsidiary; that a portion of Peat Meadow Park is traversed by a 300-foot easement owned by CL&P; and that the P.U.C., on two occasions, viewed the sites involved in both applications. The P.U.C. reviewed the testimony and determined that the matter before it required the balancing of the two great public interests already discussed. It reached the conclusion that the public interest requires the overhead construction. The P.U.C. also found that the proposed line route was selected with due consideration for the minimum interference with present land uses and favored environmental factors.

It must be remembered that in light of the evidence before the P.U.C. and the knowledge of its members of the area through which the transmission lines would run and its expertise in the field, the court cannot substitute its discretion for that vested in the commission, unless it has acted illegally or in abuse of its discretion. The plaintiff had the burden of proof as to the existence of any abuse.

*Anthony Augliera, Inc.* v. *Loughlin,* 149 Conn. 478, 482, 181 A.2d 596; see *Gimbel* v. *Loughlin,* 28 Conn. Sup. 72, 78, 250 A.2d 329. The court's task was to determine on the record whether there was a logical and rational basis for the decision of the commission. *Connecticut Television, Inc.* v. *Public Utilities Commission,* 159 Conn. 317, 328, 269 A.2d 276.

The trial court reviewed, on the record before it, the facts and conclusions reached by the commission. The court, acting within its discretion, concluded that on the evaluation of the evidence before it, the commission acted to protect the public interest. We find no merit to the claim that the P.U.C. acted arbitrarily and capriciously in weighing the evidence before it.

### (Claim H)

The P.U.C. found that "[t]he factors of overall costs and service reliability and their effect on the ratepayers and the public welfare clearly favor the overhead river crossing and overland construction." The plaintiff claims that this finding is unsupported by subordinate facts. As was the case with the plaintiff's claim E, this claim does not appear in the amended appeal or the assignment of errors, and will likewise not be considered. *Weyls* v. *Zoning Board of Appeals,* supra.

### (Claim I)

The plaintiff contends that under *Hartford Electric Light Co.* v. *Water Resources Commission,* 162 Conn. 89, 291 A.2d 721, permission for the erection of transmission lines across the tidal waters of New Haven harbor must be sought from the water resources commission and that the P.U.C. lacked jurisdiction to authorize this construction. As dis-

cussed earlier in part III of this opinion, applications for approval of such construction have been filed with the water resources commission as well as the corps of engineers and the board of harbor commissioners and this was expressly discussed during the P.U.C. hearing. The defendants UI and CL&P admit in their brief that the action taken by the P.U.C. does not in any respect purport to excuse UI from obtaining authorization from any other agency having any jurisdiction because of the crossing of navigable waters. The jurisdictional dispute thus raised does not affect our consideration of the merits of this appeal as it may relate to the action taken by the P.U.C.

## V

We next consider the claim by the plaintiff that the trial court erred in failing to conclude that various procedural errors occurred in the course of the P.U.C. proceeding which were prejudicial to the plaintiff and of such cumulative effect as to require the decision of the P.U.C. to be set aside. These alleged occurrences of procedural error consist of the following characterizations of the facts by the plaintiff: (a) The P.U.C. accepted late-filed real estate sales data from CL&P but refused exactly the same sort of evidence when it was tendered by William Donohue of the New Haven Redevelopment Agency; (b) Chairman Loughlin in his opening statements indicated a predisposition toward increasing the power supply without permitting any delay to be occasioned by environmental factors; (c) Chairman Hausman, who replaced Chairman Loughlin, was not appointed until after the hearings and Loughlin departed the hearings each day shortly before 4 p.m.

The plaintiff bases its first claim of procedural error on the contention that Donohue's letter was "exactly the same sort of evidence" submitted by CL&P and that a request to Donohue "was implicit in the testimony of Mr. Donohue in response to the request of Commissioner Cooper for the submission of such evidence."

The court found that the document submitted by Donohue constituted hearsay and it would have been inadmissible even if timely offered, and that no request was made to the P.U.C. during the public hearing for permission to file that document as a late-filed exhibit. The court concluded that the P.U.C. did not abuse its discretion in refusing to accept as a late-filed exhibit the document submitted by Donohue, and if any error occurred it was harmless because the contents of the document are without probative value. The plaintiff has assigned error as to these findings of fact and conclusions.

The study that CL&P was requested to produce and for which a late-filed exhibit number was reserved, was a study already in existence at the time of the hearing. It consisted of a comparison of selling prices for houses adjacent to a transmission line right-of-way and those located away from such a right-of-way. Donohue possessed no studies or written data at the time of his testimony and the letter in question, which was not sent until eleven days after the close of the P.U.C. hearing, consisted of purported discussions by him subsequent to the hearing.

The appendix to the plaintiff's brief includes no evidence of a reservation of a late-filed exhibit number for any submission by Donohue, and no evidence

of a "Commissioner Cooper" at the hearing. The statement that the plaintiff ascribes to "Commissioner Cooper" was apparently made by its counsel, Peter B. Cooper. Similarly, no request for the letter can be implied from the contemporaneous statements by the chairman of the P.U.C.

It is clear from the above recitation of the evidence that the findings are supported by the evidence and the conclusions are legally and logically consistent with the facts found and do not involve the application of an erroneous rule of law material to the case. Accordingly, the plaintiff's assignment of errors must fail. *State* v. *Vars,* 154 Conn. 255, 258, 224 A.2d 744; *Craig* v. *Dunleavy,* 154 Conn. 100, 105, 221 A.2d 855. Even though not bound by strict rules of evidence; *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 263, 140 A.2d 874; the commission could not have relied on hearsay evidence lacking rational probative force. *Imperial Laundry, Inc.* v. *State Board of Labor Relations,* 142 Conn. 457, 462, 115 A.2d 439.

The plaintiff in its assignment of errors also claimed that the court erred in concluding "that Commissioner Loughlin's statements were not prejudicial and grounds for his disqualification."[10] No such conclusion is contained in either the memorandum of decision or the finding. No question regarding the disqualification of Commissioner

---

[10] The plaintiff claims that the following statement at the opening of the first day of the hearing exemplifies Commissioner Loughlin's attitude: "COMMISSIONER LOUGHLIN: If we are not aware of the situation on power needs in New Haven after the officials of the United Illuminating Company have been up here to see us and tell us what the situation is, I don't know how we could be any better informed. Up to now there has been nobody to suggest they don't need transmission. Now whether it is going to be one place or

Loughlin was raised at the hearing or contained in the plaintiff's draft finding as required by Practice Book § 614. Accordingly, the claim is not properly raised and will not be considered. Practice Book § 652.

Finally, the plaintiff assigns as error the conclusion of the trial court that no error occurred in allowing Commissioner Hausman to take part in the decision although he was not a member of the P.U.C. at the time of the hearing and was not present at the hearing. This plaintiff cites no authority, and none can be found, which would disqualify Commissioner Hausman from participating in the decision because he did not personally attend the hearing.

This court has held that, even where hearings are required by statute, a commission member need not be present in order to participate in decisions "[i]f that member acquaints himself sufficiently with the issues raised and the evidence and arguments presented at the public hearing in order to exercise an informed judgment." *Loh* v. *Town Plan & Zoning Commission,* 161 Conn. 32, 42, 282 A.2d 894. In the present case no claim has been made that Commissioner Hausman failed sufficiently to prepare himself to make an informed decision, and none can be inferred from the record. The plaintiff had the burden of proof, but introduced no evidence to show that Commissioner Hausman did not sufficiently acquaint himself with the issues raised and

another is something else again. It will be too bad if we are placed in the same position here as the people in New York where companies have not been permitted to build a sufficient number of generating stations. Today they find themselves short of power and are depending upon Connecticut, New England, Canada and Tennessee and other places to fill in for their shortage of power—which I think is a disgrace."

the evidence and arguments presented at the public hearing. *Loh* v. *Town Plan & Zoning Commission,* supra, 43. We, therefore, cannot disturb the trial court's decision that no error occurred in allowing Commissioner Hausman to take part in the decision.

## VI

The plaintiff claims that the court erred in failing to conclude that the P.U.C. acted arbitrarily, capriciously and contrary to law in refusing to apply the public policy of this state as set forth in the Environmental Protection Act of 1971 (Public Acts 1971, No. 96), now part of chapter 439, General Statutes §§ 22a-14—22a-20, and in the Public Utility Environmental Standards Act (Public Acts 1971, No. 575), now chapter 277a, General Statutes §§ 16-50g—16-50w. The contention is made that the P.U.C. was required to apply the provisions of these acts to the proceeding and that it failed to do so.

As stated earlier in the opinion, on or about July 16, 1970, under the provisions of § 16-243, UI and CL&P made application to the P.U.C. for approval of the construction of the overhead transmission lines here in controversy. The P.U.C. held public hearings during July and September, 1970, and on December 1, 1971, it approved the applications, thereby permitting by its order the construction of these transmission lines within the territorial limits of New Haven. The present appeal from that order was taken on December 29, 1971.

As to chapter 277a, we have already determined that § 16-50k (d) thereof clearly expressed the legislative intent that this chapter "shall apply to any facility the construction of which is commenced on

or after April 1, 1972 . . . ." We have already construed this to mean that where construction was commenced before April 1, 1972, chapter 277a did not apply. In the absence of evidence before the P.U.C. that the construction would not commence until after April 1, 1972, the P.U.C. did not err in not considering chapter 277a. The trial court, after having reviewed the record of the P.U.C., determined that a considerable amount of preparatory work had been undertaken by UI and CL&P including the acquisition of land and rights-of-way; that except for the appeal to the Court of Common Pleas, construction could have commenced in December, 1971. Also, these defendants, on March 14, 1972, were granted a modification of the supersedeas to permit the construction of twelve foundations with anchor bolts for transmission towers. The court properly found that the construction of the facilities in question was commenced prior to April 1, 1972. It is a rule of construction that statutes are not to be applied retroactively to pending actions, unless the legislature clearly expresses an intent that they shall be so applied. *Lavieri* v. *Ulysses*, 149 Conn. 396, 401, 180 A.2d 632; see *Old Saybrook* v. *Public Utilities Commission*, 100 Conn. 322, 325–27, 124 A. 33. "The passage or repeal of an act shall not affect any action then pending." General Statutes § 1-1. The plaintiff sought to have the trial court apply chapter 277a, in spite of its effective date, to the pending action on appeal before us. The trial court was correct in refusing to do so. We find that the court did not err when it concluded that Public Act No. 575 did not apply.

The issue concerning the applicability to the proceeding of 1971 Public Acts, No. 96, which became effective May 26, 1971, was neither assigned

as error nor was it raised in the hearing before the
P.U.C. This court shall not be bound to consider
any errors on an appeal unless they are specifically
assigned and unless it appears on the record that
the question was distinctly raised at the trial and
was ruled upon and decided by the court adversely
to the appellant's claim, or that it arose subsequent
to the trial. Practice Book § 652. The court's memo-
randum of decision does not discuss Public Act No.
96 and in the plaintiff's assignment of errors no
claim is made that the court erroneously failed to
do so.

General Statutes § 22a-19[11] of the Environmental
Protection Act of 1971 provides for intervention
and participation before a body such as the P.U.C.
The record certified by the P.U.C. contains no such
verified pleading before or after May 26, 1971, the
effective date of the act. The last day of the hear-
ing before the P.U.C. was September 28, 1970, and
the petition was approved on December 1, 1971.
Clearly, the provisions of 1971 Public Act No. 96
could not have been invoked before the P.U.C. in a
manner so as to enable the trial court to determine
whether the P.U.C. acted illegally or exceeded or
abused its powers. See *Hartford Electric Light Co.*
v. *Water Resources Commission,* 162 Conn. 89, 107,

[11] Section 22a-19 of the General Statutes recites in part as follows:
"(a) In any administrative, licensing or other proceeding, and in
any judicial review thereof made available by law, the attorney
general, any political subdivision of the state, any instrumentality
or agency of the state or of a political subdivision thereof, any
person, partnership, corporation, association, organization or other
legal entity may intervene as a party on the filing of a verified
pleading asserting that the proceeding or action for judicial review
involves conduct which has, or which is reasonably likely to have,
the effect of unreasonably polluting, impairing or destroying the
public trust in the air, water or other natural resources of the
state."

291 A.2d 721. It follows that the issue concerning 1971 Public Act No. 96 is improperly before us and requires no further discussion.

## VII

The plaintiff claims that the court erred in failing to conclude that the delegation to the P.U.C. of exclusive jurisdiction over the method and construction of transmission lines is unconstitutional for lack of adequate standards. The court found that no constitutional rights of the city of New Haven "had been impinged upon." To this the plaintiff has assigned error, but its claim of error is without merit. "The standards with regard to public utilities are those contained in the legislation pertaining specifically to the public utilities commission and the public utilities under its jurisdiction. These standards have long since been held adequate to meet the test of constitutionality in the respect now urged." *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 268, 140 A.2d 874; *Connecticut Co.* v. *Norwalk,* 89 Conn. 528, 531, 94 A. 992; cf. *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 670, 103 A.2d 535; *New Haven* v. *New Haven Water Co.,* 132 Conn. 496, 513, 45 A.2d 831.

Furthermore, this court has twice had occasion in recent years to consider the scope of § 16-243, the statutory basis for the P.U.C. authority in the present case and has quoted with approval a Superior Court decision that analyzed this section in detail. *Hartford Electric Light Co.* v. *Water Resources Commission,* 162 Conn. 89, 291 A.2d 721; *Connecticut Light & Power Co.* v. *Costello,* 161 Conn. 430, 288 A.2d 415; *Gimbel* v. *Loughlin,* 28 Conn. Sup. 72, 250 A.2d 329. While constitution-

ality was not discussed in either of these opinions, the acceptance by the court of the adequacy of § 16-243 is readily apparent. Because of the several cases affirming the constitutionality of the delegation of power to the P.U.C. and these recent cases accepting the adequacy of § 16-243, the plaintiff's claim is without merit.

There is no error.

In this opinion the other judges concurred.