OFFICE OF CONSUMER COUNSEL ET AL. *v.* DEPARTMENT OF PUBLIC UTILITY CONTROL ET AL.
(15002)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON and KATZ, Js.

Argued April 25—decision released August 1, 1995

*Peter G. Boucher*, with whom were *John B. Farley* and *Daniel P. Scapellati*, for the appellant (plaintiff city of Hartford).

*Robert P. Knickerbocker, Jr.*, with whom were *Phyllis E. Lemell* and *Robert P. Wax*, for the appellee (defendant Connecticut Light and Power Company).

*Bruce C. Johnson*, with whom, on the brief, was *John F. Merchant*, for the appellee (named plaintiff).

*William B. Heinrich*, for the appellee (defendant Connecticut Conference of Municipalities).

*Jeanne M. Sole* and *Donald S. Strait* filed a brief for the Conservation Law Foundation as amicus curiae.

KATZ, J. The sole issue in this appeal is whether the plaintiff, the city of Hartford, has standing to appeal the rate-making decision of the defendant department of public utility control (DPUC), which approved a multiyear electric utility rate increase for the defendant Connecticut Light and Power Company (CL&P). After the DPUC issued its rate-making decision, Hartford and the other plaintiff, the office of consumer counsel (OCC), appealed from that decision to the Superior Court, claiming that the DPUC lacked authority to grant a multiyear rate increase. CL&P then filed a motion to dismiss the appeal, contending that Hartford and the OCC were not "aggrieved" by the final decision and, therefore, that they lacked standing to appeal. The trial court, *Maloney, J.*, determined that the OCC, but not Hartford, was "aggrieved" by the decision of the DPUC. Accordingly, the court rendered judgment granting CL&P's motion to dismiss the appeal as to Hartford only. Hartford appealed from the judgment of dismissal to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199c.[1] We affirm the

---

[1] On September 14, 1994, this court denied CL&P's motion for supervision to the extent that it sought to vacate the stay of ancillary proceedings

judgment of the trial court, although for a reason different than that upon which the trial court relied.[2]

The following facts are relevant to this appeal. By application received by the DPUC on December 11, 1992, CL&P requested, pursuant to General Statutes § 16-19,[3] approval to increase its rates and revenues.

that had been granted by the Appellate Court, and granted the motion to the extent that it sought to vacate the stay of the rate increase, subject to CL&P's filing of a corporate assurance, that had been imposed by the Appellate Court. This court granted a modified stay of the rate increase. *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, Supreme Court, Docket No. 15002 (order, September 14, 1994).

[2] Because this appeal involves only the issue of whether the trial court properly concluded that Hartford lacks standing to appeal the rate-making decision of the DPUC, our discussion of the proceedings and analysis of the legal questions are necessarily limited to our determination of that issue. Thus, this decision is not intended to suggest our view of the merits of the underlying administrative appeal.

[3] General Statutes § 16-19 provides in relevant part: "AMENDMENT OF RATE SCHEDULE; INVESTIGATIONS AND FINDINGS BY DEPARTMENT; HEARINGS; DEFERRAL OF MUNICIPAL RATE INCREASES; REFUNDS; NOTICE OF APPLICATION FOR RATE AMENDMENT, INTERIM RATE AMENDMENT AND REOPENING OF RATE PROCEEDING. (a) No public service company may charge rates in excess of those previously approved by the authority or the department of public utility control except that any rate approved by the Public Utilities Commission or the authority shall be permitted until amended by the authority or the department, that rates not approved by the authority or the department may be charged pursuant to subsection (b) of this section, and that the hearing requirements with respect to adjustment clauses are as set forth in section 16-19b. Each public service company shall file any proposed amendment of its existing rates with the department in such form and in accordance with such reasonable regulations as the department may prescribe. Each electric, gas or telephone company filing a proposed amendment shall also file with the department an estimate of the effects of the amendment, for various levels of consumption, on the household budgets of high and moderate income customers and customers having household incomes not more than one hundred fifty per cent of the federal poverty level. Each electric company shall also file such an estimate for space heating customers. Each water company, except a water company that provides water to its customers less than six consecutive months in a calendar year, filing a proposed amendment, shall also file with the department a plan for promoting water conservation by customers in such form and in accordance with a memorandum of understanding entered into by the department pursuant to section 4-67e. Each public service com-

In its application, CL&P made two separate proposals: (1) a three year rate plan designed to increase its revenues by $127 million or 6.2 percent for rates effec-

pany shall notify each customer who would be affected by the proposed amendment, by mail, at least one week prior to the public hearing thereon, that an amendment has been or will be requested. Such notice shall also indicate (1) the department of public utility control telephone number for obtaining information concerning the schedule for public hearings on the proposed amendment and (2) whether the proposed amendment would, in the company's best estimate, increase any rate or charge by twenty per cent or more, and, if so, describe in general terms any such rate or charge and the amount of the proposed increase, provided no such company shall be required to provide more than one form of the notice to each class of its customers. In the case of a proposed amendment to the rates of any public service company, the department shall hold a public hearing thereon, except as permitted with respect to interim rate amendments by subsection (d) and subsection (g) of this section, and shall make such investigation of such proposed amendment of rates as is necessary to determine whether such rates conform to the principles and guidelines set forth in section 16-19e, or are unreasonably discriminatory or more or less than just, reasonable and adequate, or that the service furnished by such company is inadequate to or in excess of public necessity and convenience. The department, if in its opinion such action appears necessary or suitable in the public interest may, and, upon written petition or complaint of the state, under direction of the governor, shall, make the aforesaid investigation of any such proposed amendment which does not involve an alteration in rates. If the department finds any proposed amendment of rates to not conform to the principles and guidelines set forth in section 16-19e, or to be unreasonably discriminatory or more or less than just, reasonable and adequate to enable such company to provide properly for the public convenience, necessity and welfare, or the service to be inadequate or excessive, it shall determine and prescribe, as appropriate, an adequate service to be furnished or just and reasonable maximum rates and charges to be made by such company. In the case of a proposed amendment filed by an electric, gas or telephone company, the department shall also adjust the estimate filed under this subsection of the effects of the amendment on the household budgets of the company's customers, in accordance with the rates and charges approved by the department. The department shall issue a final decision on each rate filing within one hundred fifty days from the proposed effective date thereof, provided it may, before the end of such period and upon notifying all parties and intervenors to the proceedings, extend the period by thirty days."

General Statutes § 16-19e provides in relevant part: "GUIDELINES FOR TRANSFER OF ASSETS AND FRANCHISES, PLANT EXPANSION, INTERNAL UTILITY MANAGEMENT AND RATE STRUCTURES. PUBLIC HEARING. POLICY COOR-

tive March 1, 1993, by $111 million or 5.2 percent for rates effective January 1, 1994, and by $120 million or 5.1 percent for rates effective January 1, 1995; and

DINATION AMONG STATE AGENCIES. PARTIES TO RATE PROCEEDING. (a) In the exercise of its powers under the provisions of this title, the department of public utility control shall examine and regulate the transfer of existing assets and franchises, the expansion of the plant and equipment of existing public service companies, the operations and internal workings of public service companies and the establishment of the level and structure of rates in accordance with the following principles: (1) That there is a clear public need for the service being proposed or provided; (2) that the public service company shall be fully competent to provide efficient and adequate service to the public in that such company is technically, financially and managerially expert and efficient; (3) that the department and all public service companies shall perform all of their respective public responsibilities with economy, efficiency and care for the public safety, and so as to promote economic development within the state with consideration for energy and water conservation, energy efficiency and the development and utilization of renewable sources of energy and for the prudent management of the natural environment; (4) that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable; (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation and (6) that the rates, charges, conditions of service and categories of service of the companies not discriminate against customers which utilize renewable energy sources or cogeneration technology to meet a portion of their energy requirements.

"(b) The department of public utility control shall promptly undertake a separate, general investigation of, and shall hold at least one public hearing on new pricing principles and rate structures for electric companies and for gas companies to consider, without limitation, long run incremental cost of marginal cost pricing, peak load or time of day pricing and proposals for optimizing the utilization of energy and restraining its wasteful use and encouraging energy conservation, and any other matter with respect to pricing principles and rate structures as the department shall deem appropriate. The department shall determine whether existing or future rate structures place an undue burden upon those persons of poverty status and shall make such adjustment in the rate structure as is necessary or desirable to take account of their indigency. The department shall require the utilization of such new principles and structures to the extent that the department determines that their implementation is in the public interest and necessary or desirable to accomplish the purposes of this provision without being unfair or discriminatory or unduly burdensome or disruptive to

(2) a one year plan designed to increase its revenues by $250 million or 12.5 percent for rates effective May 1, 1993.[4]

The rate application was assigned to a panel of three commissioners of the public utilities control authority (PUCA) pursuant to General Statutes § 16-2 (c).[5] Each

any group or class of customers, and determines that such principles and structures are capable of yielding required revenues. In reviewing the rates and rate structures of electric and gas companies, the department shall take into consideration appropriate energy policies, including those of the state as expressed in subsection (c) of this section. The authority shall issue its initial findings on such investigation by December 1, 1976, and its final findings and order by June 1, 1977; provided that after such final findings and order are issued, the department shall at least once every two years undertake such further investigations as it deems appropriate with respect to new developments or desirable modifications in pricing principles and rate structures and, after holding at least one public hearing thereon, shall issue its findings and order thereon."

[4] The DPUC characterized the application as "unique" because it proposed two alternatives.

[5] General Statutes § 16-2 provides in relevant part: "PUBLIC UTILITIES CONTROL AUTHORITY. MEMBERS, APPOINTMENT, TERM, QUALIFICATIONS. EXECUTIVE DIRECTOR. STAFF. ETHICS. (a) There shall continue to be a Public Utilities Control Authority, which shall consist of five electors of this state, appointed by the governor with the advice and consent of both houses of the general assembly. Not more than three members of said authority in office at any one time shall be members of any one political party. On or before July 1, 1983, and quadrennially thereafter, the governor shall appoint three members to the authority and on or before July 1, 1985, and quadrennially thereafter, the governor shall appoint two members. All such members shall serve for a term of four years. The procedure prescribed by section 4-7 shall apply to such appointments, except that the governor shall submit each nomination on or before May first, and both houses shall confirm or reject it before adjournment sine die. The commissioners shall be sworn to the faithful performance of their duties. . . .

"(c) Any matter coming before the authority may be assigned by the chairperson to a panel of three commissioners, not more than two of whom shall be members of the same political party. Except as otherwise provided by statute or regulation, the panel shall determine whether a public hearing shall be held on the matter, and may designate one or two of its members to conduct such hearing or appoint an examiner to ascertain the facts and report thereon to the panel. The decision of the panel, if unanimous, shall be the decision of the authority. If the decision of the panel is not unanimous, the matter shall be referred to the entire authority for decision."

of the following was recognized to be a party to the proceeding:[6] (1) CL&P; (2) the OCC; (3) the prosecutorial division of the DPUC; (4) the state of Connecticut department of economic development; and (5) the state of Connecticut office of policy and management. Each of the following was granted intervenor status:[7] (1)

---

[6] Section 16-1-16 of the Regulations of Connecticut State Agencies provides: "DESIGNATION OF PARTIES

"In issuing the notice of hearing the commissioners will name as parties those persons whose legal rights, duties or privileges are being determined in the contested case and any person whose participation as a party is necessary to the proper disposition of such proceeding. All other persons proposing to be named or admitted as parties shall apply for such designation in the manner hereinafter described."

Section 16-1-17 of the Regulations of Connecticut State Agencies provides: "APPLICATION TO BE DESIGNATED A PARTY

"(a) FILING OF PETITION. Any other person who proposes to be named or admitted as a party to any proceeding shall file a written petition to be so designated not later than five (5) days before the date of the hearing of the proceeding as a contested case.

"(b) CONTENTS OF PETITION. The petition shall state the name and address of the petitioner. It shall describe the manner in which the petitioner claims to be substantially and specifically affected by the proceeding. It shall state the contention of the petitioner concerning the issue of the proceeding, the relief sought by the petitioner, and the statutory or other authority therefor, and the nature of the evidence, if any, that the petitioner intends to present in the event that the petition is granted.

"(c) DESIGNATION AS PARTY. The commissioners shall consider all such petitions and will name or admit as a party any person whose legal rights, duties or privileges will be determined by the decision of the commissioners after a hearing, if the commissioners find such person is entitled as of right to be a party to said contested case or that the participation of such person as a party is necessary to the proper disposition of said contested case."

[7] Section 16-1-18 of the Regulations of Connecticut State Agencies provides: "APPLICATION TO BE AN INTERVENOR

"(a) REQUEST TO PARTICIPATE. At any time prior to the commencement of oral testimony in any hearing on a contested case any person may request that the presiding officer permit that person to participate in the hearing as an intervenor.

"(b) CONTENTS OF REQUEST. In so requesting, the proposed intervenor shall state the person's name and address and shall describe the manner in which said person is affected by the contested case. The proposed intervenor shall further state in what way and to what extent that person proposes to participate in the hearing.

Hartford;[8] (2) Dan Carlinsky; (3) the Connecticut Business and Industry Association; (4) the Connecticut Conference of Municipalities (CCM); (5) the Connecticut Cogeneration Coalition; (6) the Connecticut Industrial Energy Consumers; (7) the Conservation Law Foundation; (8) the Enfield town council; (9) the Heritage

"(c) DESIGNATION AS INTERVENOR. The presiding officer will determine the proposed intervenor's participation in the hearing, taking into account whether or not such participation will furnish assistance to the commissioners in resolving the issues of the contested case."

Section 16-1-19 of the Regulations of Connecticut State Agencies provides: "PARTICIPATION BY INTERVENOR

"The intervenor's participation shall be limited to those particular issues, that state of the proceeding, and that degree of involvement in the presentation of evidence and argument that the presiding officer shall expressly permit at the time such intervention is allowed."

[8] On January 6, 1993, Hartford filed a petition to intervene in the ratemaking proceedings, in which petition Hartford stated:

"1. CL&P has requested the approval of the Department of Public Utility Control to increase its rates by approximately 12.6% in 1993; or, in the alternative, to increase its rates by 6.1% in 1993, 5.4% in 1994, and 5.3% in 1995;

"2. Approval of either of CL&P's alternative rate increase proposals would seriously jeopardize the ability of the City of Hartford as a consumer of electricity, and of its inhabitants as electricity consumers, to continue to meet existing financial burdens and economic necessities;

"3. Approval of such increases in the cost of energy would also undermine the ability of the City and its inhabitants to recover from the current economic recession as soon as possible;

"4. Approval of such increases in the cost of energy would seriously disadvantage the ability of the City of Hartford and its inhabitants in the competition for jobs and investment with other parts of the region and the country;

"5. The office of corporation counsel has authorized the undersigned to represent the City of Hartford in this proceeding.

"WHEREFORE, the undersigned requests that the City of Hartford be designated as an intervenor in this case."

The motion to intervene was granted by the DPUC on January 13, 1993. Moreover, although CL&P asserted during oral argument that Hartford had requested, yet was denied, party status, our review of the record reveals that Hartford never filed a motion to be designated a party to the ratemaking proceedings. Cf. Application of Town of Southbury to Intervene as a Party (filed on February 4, 1993; denied party status, but granted intervenor status on February 10, 1993).

Village Civic Association; (10) the Heritage Village Master Association; (11) the Housatonic Valley Council of Elected Officials; (12) the state of Connecticut office of the attorney general; (13) the Taylor and Fenn Company; (14) the town of New Milford; (15) the town of Southbury; and (16) the Western Connecticut Industrial Council.

After the DPUC and CL&P had discussed preliminary matters, Hartford filed a "Motion to Dismiss the Multi-Year Rate Plan" dated February 3, 1993. The DPUC requested and received written comments and heard oral argument on the motion, and thereafter, on February 18, 1993, the PUCA denied that motion.[9] On February 16, 1993, CL&P filed supplemental information with the DPUC proposing a base rate increase of $152 million or 7.3 percent in May, 1993, $141 million or 6.3 percent on May 1, 1994, and $70 million or 3.2 percent on May 1, 1995. Thereafter, on February 19, 1993, Hartford filed motions requesting the PUCA to dismiss CL&P's amendment of February 16, 1993, and to order CL&P to comply with "Standard Filing Requirements with Regard to CL&P's Rate Increase Proposals for the Years 1994 and 1995." After requesting and receiving written comments, the PUCA denied these motions on March 10, 1993. On March 12, 1993, CL&P filed revised data indicating a proposed one year increase of $279 million or 13.9 percent.

Between February 11, 1993, and April 23, 1993, the DPUC held a public hearing on CL&P's application. See General Statutes § 16-19. The DPUC conducted the proceedings at its offices, but received comments from members of the public at various locations throughout the state. At the regional locations, a total of 370 customers were in attendance, eighty-five of whom spoke

---

[9] We distinguish, as did the DPUC in its rate-making decision, between acts of the DPUC and those of the PUCA.

on the record. These customers generally disagreed with the proposed increases and expressed concern about the impact that such increases would have on the already ailing state economy. Others commented on the overall rate structure (i.e., which rate classes should bear more or less of the proposed burden) and the availability of special programs. For example, Hartford emphasized the economic plight of its citizens, and recommended the use of low income discounts, special conservation projects for depressed cities, and energy efficiency for public and low income housing.[10]

On April 29, 1993, after negotiations among Hartford and others, there was filed with the DPUC a "Partial Settlement Agreement of City of Hartford, Office of Consumer Counsel, Office of Attorney Gen-

---

[10] The deputy city manager of Hartford, Patricia M. Williams, testified as to Hartford's poor fiscal condition and the effect that CL&P's proposed rate increase would have on it. She stated that Hartford's main source of revenue, the property tax, had consistently decreased over the years while the delinquency rate had increased. Thus, the reduction in revenue placed great strain on the city's ability to provide for its citizens, a disproportionate number of whom were poor and at or below the poverty level. Additionally, she testified that Hartford was the country's fourth poorest city, had the nation's second highest rate of poverty among children, and had higher rates of unemployment and those on public assistance. Further, she stated that Hartford was one of only eleven "distressed municipalities" in Connecticut, as defined by General Statutes § 32-9p (b), due to its "high unemployment and poverty, aging housing stock and . . . low or declining [rate] of growth in job creation, population and per capita income."

Moreover, Williams stated that "Hartford's declining tax base and revenue collections, coupled with the staggering cost of supporting the city's poverty population, has created a fiscal crisis that will only intensify with CL&P's proposed rate increases once approved. The deferral of any such increases pursuant to Section 16-19 (e) of the General Statutes will minimally aid the City under the circumstances I have described in my previous testimony. . . . These increases [proposed by CL&P] would seriously reduce the City's ability to provide the necessary services to its residents." In light of these factors, Hartford urged the DPUC to consider: (1) the use of a marginal-cost-based rate for low income customers that assures such customers of access to essential energy services; and (2) targeting collaborative conservation and load management budget funds to programs for low income, commercial, industrial and other customers in urban areas.

eral, Prosecutorial and The Connecticut Light and Power Company" (partial settlement). The partial settlement provided for some low income discounts and increased funding for energy conservation programs, as requested by Hartford, in return for Hartford's agreement not to challenge the authority of the DPUC to consider multiyear rate increases.[11] The partial settlement stipulated, however, that all of the signatories' legal claims would be revived if the DPUC rejected any of its provisions.

The hearing was closed by "Notice of Close of Hearing" on May 3, 1993. On May 4, 1993, the DPUC

[11] Hartford also agreed, subject to DPUC's approval of the partial settlement, to waive the claim that it had made on the basis of General Statutes § 16-19j. That section provides: "PORTION OF DEPARTMENT STAFF TO BE MADE PARTY TO CERTAIN RATE PROCEEDINGS. (a) Notwithstanding any provision of the general statutes or of any regulation to the contrary, on and after July 1, 1984, the Public Utilities Control Authority may require a portion of the staff of the department to be made a party to the proceedings on any proposed rate amendment under section 16-19, provided the authority shall require a portion of the staff to be made a party during the fiscal year beginning July 1, 1985, to the proceedings on each rate amendment proposed by an electric company or a telephone company, as defined in section 16-1, having more than five hundred thousand customers and, on and after July 1, 1986, to the proceedings on each rate amendment proposed by each public service company, as defined in said section, having more than seventy-five thousand customers.

"(b) The department staff assigned to participate as a party to any such proceedings shall review the proposed rate amendment filed by the company and shall file with the commissioners of the department proposed modifications of the rate amendment. Such modifications shall carry out the purposes of subsection (a) of section 16-19e and section 16a-35k. Such staff shall appear and participate in the proceedings in support of its proposed modifications and may employ outside consultants knowledgeable in the utility regulation field.

"(c) The members of the Public Utilities Control Authority shall not communicate directly or indirectly with the staff of the department participating as a party to any such proceedings or with any other party to the proceedings concerning any issue of fact or law involved in the proceedings, except upon notice and opportunity for all parties to participate.

"(d) The members of such authority shall make their decision on a proposed rate amendment solely on the basis of the record of the proceedings, including all briefs and documents filed by the parties and intervenors."

notified all parties and intervenors that, pursuant to General Statutes § 16-19 (a),[12] it had extended by thirty days the time by which it would issue a final decision. On June 1, 1993, the DPUC issued a draft decision and invited all parties and intervenors to file written exceptions and present oral arguments. The DPUC issued its final decision on June 16, 1993.

In its decision, the DPUC approved, with modification, CL&P's proposal for a three year rate increase. It approved increases of approximately $46 million for 1993, approximately $47 million for 1994, and approximately $48 million for 1995, or approximately 2 percent for each year.[13] In doing so, it stated, inter alia, that CL&P "proposed the three-year plan to provide customers with a predictable, gradually increasing, rate path over the next three years that would assist both business and residential customers in planning and budgeting for their needs. The Plan shifts rate increases from the near term, when the recession is creating a hardship on customers, to a period when economic recovery can make paying higher rates somewhat easier." Furthermore, it expressly rejected the partial settlement and, accordingly, recognized Hartford's contractual right to pursue its "jurisdictional challenge to the authority of the [DPUC] to act on CL&P's multi-year rate plan."

On July 29, 1993, Hartford and the OCC appealed from the decision of the DPUC to the Superior Court[14]

---

[12] General Statutes § 16-19 (a) provides in relevant part: "The [DPUC] shall issue a final decision on each rate filing within one hundred fifty days from the proposed effective date thereof, provided it may, before the end of such period and upon notifying all parties and intervenors to the proceedings, extend the period by thirty days."

[13] The increases for each rate class ranged from 1.1 percent to 2.7 percent annually.

[14] They named as defendants the DPUC and all of the other entities that had participated in the administrative case as a party or as an intervenor.

pursuant to General Statutes §§ 16-35 and 4-183,[15] claiming that the DPUC lacked subject matter jurisdiction to approve a rate-change for more than one year.[16] Thereafter, CL&P moved to dismiss the appeal on the basis that Hartford and the OCC had failed to establish that they were "aggrieved" by the final decision of the DPUC as required by §§ 16-35 and 4-183 (a).

On May 9, 1994, the trial court granted the motion as to Hartford and denied it as to the OCC. In doing so, the court applied the two-part aggrievement standard set forth in *Light Rigging Co.* v. *Dept. of Public Utility Control*, 219 Conn. 168, 173, 592 A.2d 386 (1991), requiring an appellant to show both "a specific personal and legal interest in the subject matter of the decision" *and* "that the specific personal and legal interest has been specially and injuriously affected by the decision." (Internal quotation marks omitted.) The court determined that the OCC had met the first part of the test on the basis of General Statutes § 16-2a (a),

---

[15] General Statutes § 16-35 provides: "APPEALS TO SUPERIOR COURT. Any company, town, city, borough, corporation or person aggrieved by any order, authorization or decision of the department of public utility control, except an order, authorization or decision of the department approving the taking of land, in any matter to which he or it was or ought to have been made a party, may appeal therefrom in accordance with the provisions of section 4-183. The party so appealing shall give bond to the state, with sufficient surety, for the benefit of the adverse party, in such sum as the department fixes, to pay all costs in case he or it fails to sustain such appeal."

General Statutes § 4-183 provides in relevant part: "APPEAL TO SUPERIOR COURT. (a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal. . . ."

[16] More specifically, they claimed that the decision was: "(1) in violation of constitutional and statutory provisions; (2) in excess of the DPUC's statutory authority; (3) made upon unlawful procedure; (4) affected by other errors of law; (5) clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; and (6) arbitrary and capricious and characterized by an abuse of discretion and clearly unwarranted exercise of discretion."

and concluded that the second part was satisfied due to the $47 million and $48 million increases that the DPUC had approved for 1994 and 1995, respectively. The court granted the motion to dismiss as to Hartford, however, because that plaintiff had failed to demonstrate "a legal interest in the subject matter of the [DPUC's] decision that is different from that of other members of the public when they purchase electric service." Hartford appealed from the judgment of dismissal.[17] We affirm.

"Pleading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal. *Bakelaar* v. *West Haven*, 193 Conn. 59, 65, 475 A.2d 283 (1984). It is [therefore] fundamental that, in order to have standing to bring an administrative appeal, a person must be aggrieved. *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, 214 Conn. 726, 729, 573 A.2d 736 (1990) (*CBIA I*); *Beckish* v. *Manafort*, 175 Conn. 415, 419, 399 A.2d 1274 (1978). Standing [however] is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. See, e.g., *Baker* v. *Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); *Stern* v. *Stern*, 165 Conn. 190, 192, 332 A.2d 78 (1973). . . . *Board of Pardons* v. *Freedom of Information Commission*, 210 Conn. 646, 648–49, 556 A.2d 1020 (1989)." (Internal quotation marks omitted.) *Light Rigging Co.* v. *Dept. of Public Utility Control*, supra, 219 Conn. 172.

---

[17] In addition to the briefs filed by Hartford and CL&P, CCM and the OCC filed a joint brief in support of Hartford's position. Also, the Conservation Law Foundation filed a brief as amicus curiae.

"The fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision. . . . *Cannavo Enterprises, Inc.* v. *Burns*, 194 Conn. 43, 47, 478 A.2d 601 (1984); *Bakelaar* v. *West Haven*, [supra, 193 Conn. 65]. *State Medical Society* v. *Board of Examiners in Podiatry*, [203 Conn. 295, 299–300, 524 A.2d 636 (1987)]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *Light Rigging Co.* v. *Dept. of Public Utility Control*, supra, 219 Conn. 173.

The parties agree that this two-part test controls the issue of aggrievement in this case. They disagree, however, as to whether the trial court correctly determined that Hartford lacks the "specific personal and legal interest in the subject matter of the decision" necessary to satisfy the first part. Additionally, they disagree about whether any such interest was "adversely affected" by the decision of the DPUC sufficient to satisfy the second part.

Hartford essentially argues that it possesses a specific personal and legal interest in the decision of the DPUC on the basis of the following two factors: (1) the existence of the comprehensive statutory framework for public utility rate-making, under which "[a]ll public service company ratepayers are legally entitled to have their rates adhere to" specific requirements; and (2) its extensive participation in the underlying admin-

istrative proceedings. Hartford contends that the presence of these factors distinguishes its case from our decisions in *CBIA I,* supra, 214 Conn. 726, and *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care,* 218 Conn. 335, 589 A.2d 356 (1991) (*CBIA II*), in which we determined that the plaintiffs had not been aggrieved by the decision of the commission on hospitals and health care (CHHC) that had permitted increased hospital revenue because the plaintiffs had failed "to demonstrate a legal interest in the subject matter of the decisions [of the agency] that can be distinguished from the interest of the general public in hospital rate increases." *CBIA I,* supra, 734. In Hartford's view, this case is more analogous to *Light Rigging Co.,* in which we concluded that the plaintiffs, holders of certificates of public convenience and necessity, had been aggrieved by a decision of the DPUC granting a similar certificate to one of the plaintiffs' competitors. *Light Rigging Co.* v. *Dept. of Public Utility Control,* supra, 219 Conn. 178.

CL&P asserts, on the other hand, that the trial court properly concluded that the public utility regulatory scheme affords Hartford no greater interest in this decision of the DPUC than that afforded by the hospital regulatory scheme to the unsuccessful plaintiffs in *CBIA I* and *CBIA II,* and that Hartford's participation, no matter how extensive, cannot compensate for its lack of interest. Further, CL&P contends that, regardless of whether Hartford satisfies the aggrievement requirement, Hartford lacks standing to appeal the decision of the DPUC because it has failed to show that "it was or ought to have been made a party" to the rate-making proceedings as independently required by § 16-35.

We agree with CL&P that § 16-35 requires an appellant to establish in the Superior Court that "he or it

was or ought to have been made a party" to the particular proceeding of the DPUC from which "he or it" seeks to appeal, and that Hartford has failed to satisfy this requirement. Consequently, we conclude on this basis that Hartford lacks standing to appeal the rate-making decision of the DPUC.[18]

"Appeals to courts from administrative agencies exist only under statutory authority. *Charles Holdings, Ltd.* v. *Planning & Zoning Board of Appeals*, 208 Conn. 476, 479, 544 A.2d 633 (1988); *Tazza* v. *Planning & Zoning Commission*, 164 Conn. 187, 190, 319 A.2d 393 (1972). A statutory right to appeal may be taken advantage of only by strict compliance with the statutory provisions by which it is created. *Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities*, 201 Conn. 350, 356, 514 A.2d 749 (1986); *Norwich Land Co.* v. *Public Utilities Commission*, 170 Conn. 1, 6, 363 A.2d 1386 (1975). Such provisions are mandatory, and, if not complied with, the appeal is subject to dismissal. *Basilicato* v. *Department of Public Utility Control*, 197 Conn. 320, 322, 497 A.2d 48 (1985); *Royce* v. *Freedom of Information Commission*, 177 Conn. 584, 587, 418 A.2d 939 (1979). *Vernon Village, Inc.* v. *Carothers*, [217 Conn. 130, 142, 585 A.2d 76 (1991)]." (Internal quotation marks omitted.) *Raines* v. *Freedom of Information Commission*, 221 Conn. 482, 489–90, 604 A.2d 819 (1992). Dismissal is required in such a situation because, if the appellant lacks standing to appeal the case, the court lacks jurisdiction to hear the appeal. *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 223, 602 A.2d 1019 (1992). A jurisdictional defect may be brought to the attention of the court at any time, and, if the court lacks jurisdiction, it must dismiss the case either on the motion of a party or on its own motion.[19]

[18] Because Hartford lacks standing for this reason, we need not discuss whether it satisfies the aggrievement requirement.

[19] Thus, it is of no consequence that CL&P makes this claim for the first time in its brief to this court. Furthermore, although the dissent implies

*Hartford Principals' & Supervisors' Assn.* v. *Shedd,* 202 Conn. 492, 497–98, 522 A.2d 264 (1987); *Sullivan* v. *Board of Police Commissioners,* 196 Conn. 208, 213, 491 A.2d 1096 (1985).

The right to appeal from a rate-making decision of the DPUC is set forth in § 16-35 of the General Statutes. That section provides: "Any company, town, city, borough, corporation or person aggrieved by any order, authorization or decision of the department of public utility control, except an order, authorization or decision of the department approving the taking of land, in any matter to which he or it was or ought to have been made a party, may appeal therefrom in accordance with the provisions of section 4-183. The party so appealing shall give bond to the state, with sufficient surety, for the benefit of the adverse party, in such sum as the department fixes, to pay all costs in case he or it fails to sustain such appeal."

While it is well established that an appellant must be "aggrieved" to have standing to appeal under this statute; see, e.g., *Light Rigging Co.* v. *Dept. of Public Utility Control,* supra, 219 Conn. 172; this court has not yet specifically construed the meaning of the phrase "in any matter to which he or it was or ought to have been made a party" in § 16-35. Because it involves statutory interpretation, this issue presents a question of law for this court. *Rose* v. *Freedom of Information Commission,* supra, 221 Conn. 225; *Elections Review*

that *New Haven* v. *Public Utilities Commission,* 165 Conn. 687, 700, 345 A.2d 563 (1974), stands for the proposition that a litigant need only establish aggrievement to appeal a decision of the DPUC, there is nothing to suggest that the issue of the meaning of the term "party" in the phrase "in any matter to which he or it was or ought to have been made a party" had been raised by the parties or otherwise brought to the attention of the court in that case. Consequently, we do not read *Public Utilities Commission* as suggesting a different conclusion in this case.

*Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, 219 Conn. 685, 692, 595 A.2d 313 (1991).

The purpose of statutory construction is to give effect to the intended purpose of the legislature. *Dos Santos* v. *F. D. Rich Construction Co.*, 233 Conn. 14, 20, 658 A.2d 83 (1995); *Vaillancourt* v. *New Britain Machine/Litton*, 224 Conn. 382, 390, 618 A.2d 1340 (1993); *Rose* v. *Freedom of Information Commission*, supra, 221 Conn. 225. If the language of a statute is plain and unambiguous, we need look no further than the words actually used because we assume that the language expresses the legislature's intent. *Dos Santos* v. *F. D. Rich Construction Co.*, supra, 20; *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 193, 530 A.2d 171 (1987). In such a case, therefore, we need not construe the statute by reference to its history and purpose. *Rose* v. *Freedom of Information Commission*, supra, 225; *Winslow* v. *Lewis-Shepard, Inc.*, 216 Conn. 533, 538, 582 A.2d 1174 (1990). In every case, however, we interpret a statutory term in light of its context and not in isolation. *Rose* v. *Freedom of Information Commission*, supra, 226; *Lieberman* v. *Reliable Refuse Co.*, 212 Conn. 661, 669, 563 A.2d 1013 (1989).

CL&P contends that the language of § 16-35 requires an appellant affirmatively to show either that it was a party to the underlying administrative proceeding, rather than an intervenor or some other form of participant, or that it ought to have been made an actual party. In contrast, Hartford argues that, on the basis of our decision in *Rose* v. *Freedom of Information Commission*, supra, 221 Conn. 217, the term "party" does not require actual party status. Instead, in Hartford's view, the term "party" in § 16-35 has the same broader meaning that it had in *Rose*: " '[a] person concerned or having or taking part in any affair, matter, trans-

action, or proceeding, considered individually' . . .
[and] not restricted to strict meaning of plaintiff or
defendant in a lawsuit." Id., 227.

In *Rose* v. *Freedom of Information Commission,*
supra, 221 Conn. 217, this court was required to inter-
pret the meaning of the term "party" within the frame-
work of General Statutes § 1-21i (d). That provision
provides in relevant part: "Any *party* aggrieved by the
decision of [the Freedom of Information Commission]
may appeal therefrom, in accordance with the provi-
sions of section 4-183." (Emphasis added.) In constru-
ing the term, we first recognized that the term "party"
ordinarily has a "technical legal meaning, referring 'to
those by or against whom a legal suit is brought . . .
the party plaintiff or defendant, whether composed of
one or more individuals and whether natural or legal
persons.' . . ." *Rose* v. *Freedom of Information Com-
mission,* supra, 226, quoting Black's Law Dictionary
(5th Ed.). In *Rose,* we decided not to afford the term
that narrow a meaning, however, because it would have
led, in the context of § 1-21i (d), to "unacceptable
results." *Rose* v. *Freedom of Information Commission,*
supra, 226. Instead, we interpreted the term "party"
in its broader sense, namely " '[a] person concerned
or having or taking part in any affair, matter, trans-
action, or proceeding, considered individually' and
. . . 'not restricted to strict meaning of plaintiff or
defendant in a lawsuit.' " Id., 227, quoting Black's Law
Dictionary (5th Ed.).

We declined to interpret the term "party" narrowly
to mean only those who had been granted actual party
status by the agency because doing so would have
vested in the presiding officer of the freedom of infor-
mation commission (FOIC) "the authority to decide not
only who could appear before the agency but also who
could challenge an adverse decision of the agency. . . .
We [were] doubtful that the legislature's use of the

word 'party' in § 1-21i (d) was intended to grant unfettered discretion to the FOIC to decide who can appeal the merits of its decisions." *Rose* v. *Freedom of Information Commission,* supra, 221 Conn. 226.

Moreover, our examination in *Rose* of the legislative history of § 1-21i (d) confirmed that the legislature had not intended the word "party" to be defined more narrowly as "actual party." We noted that prior to a 1977 amendment, § 1-21i (d) had provided that " '[a]ny *person* aggrieved by the decision of [the FOIC] may appeal therefrom . . . .' (Emphasis added.) General Statutes (Rev. to 1977) § 1-21i (d)." *Rose* v. *Freedom of Information Commission,* supra, 221 Conn. 227. The legislative history of No. 77-403 of the 1977 Public Acts, which repealed the language using the word "person" and added language using the word "party," revealed that the word "person" was defined in the Freedom of Information Act to mean "natural person, partnership, corporation, association or society"; *Rose* v. *Freedom of Information Commission,* supra, 228; see General Statutes § 1-18a (c); and that the legislature had made the change to the word "party" merely to allow " 'state agencies who are aggrieved by a decision to appeal.' " *Rose* v. *Freedom of Information Commission,* supra, 228, quoting House Bill No. 8080, statement of purpose; see also 20 S. Proc., Pt. 7, 1977 Sess., p. 2798, remarks of Senator Salvatore C. DePiano. In view of the provision's past use of the word "person," and in recognition of the general proposition that "[a]n amendatory act is presumed not to change the existing law further than is expressly declared or necessarily implied . . ."; (internal quotation marks omitted) *Rose* v. *Freedom of Information Commission,* supra, 229; *Doe* v. *Institute of Living, Inc.,* 175 Conn. 49, 63, 392 A.2d 491 (1978); we necessarily concluded that "the use of 'party' in § 1-21i (d) does

not now require party status in an FOIC proceeding as a precondition for standing to appeal the decision." *Rose* v. *Freedom of Information Commission*, supra, 229.

As in *Rose*, we must begin our interpretation in this case by looking to the ordinary legal meaning of the word "party." As we stated previously, this word ordinarily refers "to those by or against whom a legal suit is brought . . . the party plaintiff or defendant, whether composed of one or more individuals and whether natural or legal persons." Black's Law Dictionary (5th Ed.). Hartford would not qualify under this interpretation because it was an intervenor, rather than a party, to the rate-making proceedings. See footnote 8. Moreover, it neither pleaded nor established at the trial level that it should have been made an actual party to the proceedings. See General Statutes § 16-35 ("in any matter to which he or it was or *ought to have been made* a party" [emphasis added]). Thus, of necessity, Hartford contends that "*Rose* sets forth an analysis of the meaning of the word 'party' that is equally applicable to the DPUC as to the FOIC" and that its status as an intervenor therefore satisfies the broader meaning of "party" within § 16-35. We are unpersuaded that the *Rose* decision dictates a similar interpretation of "party" in the context of § 16-35.

First, an examination of the words actually used by the legislature in § 16-35 reveals language functionally distinct from that used in § 1-21i (d), which was at issue in *Rose*. Section 1-21i (d) refers generally to "[a]ny party aggrieved" by a decision of the FOIC. Section 16-35, on the other hand, specifies certain entities (i.e., cities, corporations or persons) that may appeal a decision of the DPUC "in any matter to which he or it was *or ought to have been made a party*." (Emphasis added.) Thus, unlike § 1-21i (d) in which the legislature used the word "party" only in combination with the word "aggrieved,"

thereby suggesting that the legislature had intended "party" to be interpreted in its broader sense as a synonym of "participant," in § 16-35 the legislature expressly used the word "made," which denotes the act of seeking and attaining actual party status.

"It is a basic tenet of statutory construction that the legislature 'did not intend to enact meaningless provisions.' *Turner* v. *Turner*, 219 Conn. 703, 713, 595 A.2d 297 (1991). Accordingly, care must be taken to effectuate all provisions of the statute. See *Pintavalle* v. *Valkanos*, 216 Conn. 412, 418, 581 A.2d 1050 (1990) ('[a] statute should be read as a whole and interpreted so as to give effect to all of its provisions'); *Hopkins* v. *Pac*, 180 Conn. 474, 476, 429 A.2d 952 (1980) (it is a 'well established principle that statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant')." *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 100–101, 653 A.2d 782 (1995). Consequently, if we were to interpret the word "party" in § 16-35 based on our interpretation of the language used in § 1-21i (d), we would be disregarding the distinct language of § 16-35 and rendering the legislature's use of the word "made" meaningless.

Second, unlike our holding in *Rose*, our construction of the word "party" in accordance with its ordinary technical meaning will not lead to "unacceptable results." Indeed, the existence of the language "ought to have been made a party" in § 16-35 eliminates any concern that, as in *Rose*, a narrow construction of the term "party" possibly could permit an administrative agency to restrict judicial review. Because a judge of the Superior Court, in deciding whether an appellant in an appeal from a decision of the DPUC has satisfied the requirements of § 16-35, must determine whether the appellant either was a party *or* ought to have been made a party, the DPUC cannot unilaterally restrict

judicial review merely by refusing to grant party status to an applicant who would otherwise be entitled to party status. Instead, just as the trial judge must determine "aggrievement" as a threshold question of fact; see, e.g., *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care*, 226 Conn. 105, 120, 122, 627 A.2d 1257 (1993); *McNally* v. *Zoning Commission*, 225 Conn. 1, 7, 621 A.2d 279 (1993); *Bakelaar* v. *West Haven*, supra, 193 Conn. 65; so too must the trial judge, in a case in which the appellant had not been made a party to the administrative proceedings, review the record to determine whether the DPUC nonetheless should have made the appellant an actual party to the proceedings. General Statutes § 16-35; see Regs., Conn. State Agencies §§ 16-1-16 through 16-1-21 (setting forth standards pursuant to which DPUC grants party and intervenor status). In turn, the protection thus afforded in § 16-35 distinguishes this statutory scheme from our concern in *Rose* that "denial of party status so as to limit appellate review might violate the due process rights of a person aggrieved by an FOIC decision." *Rose* v. *Freedom of Information Commission*, supra, 221 Conn. 226.

Third, unlike in *Rose*, our inquiry is not illuminated by the legislative history of the provision. The relevant language of § 16-35 was first enacted in chapter 128 of the 1911 Public Acts, which was based on the Fourth Substitute for Senate Bill No. 7. This language was based on language that had been used previously for other sections relating to judicial review of the decisions of administrative agencies. Our review of the history of the 1911 enactment reveals that no debates, statements or other indicia of legislative intent are available for evaluation. Consequently, we have no reason to believe, as we did in *Rose*, that the legislature used the language of this provision "to broaden, and

not to limit, access to judicial review." *Rose* v. *Freedom of Information Commission,* supra, 221 Conn. 229.[20]

In summary, we conclude that § 16-35 places the burden on the appellant to establish in the Superior Court that it was made an actual party *or* that it should have been made an actual party to the proceedings of the DPUC from which it seeks to appeal. Like the issue of satisfaction of the aggrievement requirement, compliance with this part of § 16-35 is first a threshold question of fact for the trial court. In this case, it is undisputed that Hartford was granted intervenor, but not party, status in the rate-making proceedings conducted by the DPUC. Thus, in order to have standing to appeal the decision of the DPUC pursuant to § 16-35, Hartford was required to have alleged in the Superior Court that it should have been made a party to the proceedings. Such an allegation would have afforded the trial court the opportunity to review the rate-making

---

[20] On the contrary, to the extent that the history of this provision's enactment bears on the issue presented in this case, it indicates that the legislature intended the word "party" to be interpreted more narrowly. For example, in *Bethel & Redding Lime Co.* v. *New York, New Haven & Hartford R. Co.*, 82 Conn. 135, 141, 72 A. 728 (1909), a case predating the 1911 enactment of the relevant language of § 16-35, we had construed the language of General Statutes (1902 Rev.) § 3747, which gave the right to appeal to "any person aggrieved by any order of the railroad commissioners, upon any proceeding relative to the location, abandonment, or changing of stations to which he was or ought to have been made a party." Although we did not expressly consider the issue now presented, we did suggest that the appellant, who had been made a party to the administrative proceeding, was entitled to appeal, inter alia, because it "was a party to [the commission's] final order" and was "fully a party to the proceedings." Id., 141. These references, in highlighting the appellant's status as a party to the administrative proceedings, impliedly indicated our construction of the word "party" in this context to mean an *actual* party rather than a mere participant. We may presume that the legislature knew of *Bethel & Redding Lime Co.* and our references to the word "party" within the phrase "was or ought to have been made a party" when it used the same language in § 16-35. See *Murach* v. *Planning & Zoning Commission,* 196 Conn. 192, 200 n.14, 491 A.2d 1058 (1985).

proceedings and to determine whether Hartford should have been made a party to those proceedings. If the trial court had determined that Hartford should have been made a party, Hartford would have satisfied this aspect of § 16-35.[21] Because Hartford neither alleged nor established that it should have been made a party, it has failed to establish all the elements necessary for strict compliance with § 16-35.[22] Accordingly, we affirm the trial court's dismissal of the appeal as to Hartford for lack of jurisdiction.[23]

[21] Because the trial court was never afforded the opportunity to make this threshold determination, we need not discuss the standard of review that would have governed an appeal of the trial court's determination of this issue.

[22] The dissent relies on *Mannweiler* v. *LaFlamme*, 232 Conn. 27, 36, 653 A.2d 168 (1995), for the proposition that we should remand the case to the trial court and afford Hartford the opportunity to show that it "ought to have been made a party." This reliance is misplaced. In *Mannweiler*, after concluding that we lacked subject matter jurisdiction to hear the plaintiffs' declaratory judgment action because the plaintiffs had failed to notify all indispensable parties, we afforded the plaintiffs an opportunity on remand to cure that jurisdictional defect only because those circumstances fell within an exception to the general rules concerning subject matter jurisdiction. Indeed, we recognized that "*[u]nlike other jurisdictional defects* implicating the trial court's subject matter jurisdiction . . . the bringing of a declaratory judgment action is not itself precluded by a failure to comply with the notice requirement." (Emphasis added; internal quotation marks omitted.) Id. Because this case does not fall within the *Mannweiler* exception, we do not have subject matter jurisdiction over Hartford's appeal.

[23] We need not elaborate in this case on the scope of judicial review of a decision of the DPUC to grant or not to grant party status to a particular applicant or other entity. Moreover, we have cited the DPUC's regulations pertaining to the granting of intervenor and party status merely to illustrate the factual nature of the inquiry, and we do not mean to suggest that these regulations would necessarily control the trial judge's determination of whether a particular entity should have been granted party status. See Regs., Conn. State Agencies §§ 16-1-16 through 16-1-21. Indeed, because this case does not require us to decide the scope of judicial review, we neither address nor conclude, contrary to the suggestion of the dissent, that "to be a 'party' for a right to appeal under § 16-35, the person or entity must comply with the rigorous statutory definition of 'party' set forth in General Statutes § 4-177a (a) of the Uniform Administrative Procedure Act." Thus, we certainly do not decide, as does the dissent, that "Hart-

The judgment of the trial court is affirmed and the stay of ancillary proceedings is vacated.

In this opinion PETERS, C. J., and CALLAHAN and BORDEN, Js., concurred.

BERDON, J., dissenting. Today, the majority denies the plaintiff, the city of Hartford, standing to appeal a decision of the department of public utility control (DPUC), allowing the defendant, Connecticut Light and Power Company (CL&P), an increase in its electric rates, solely on the narrow interpretation of the term "party" as used in General Statutes § 16-35.[1]

ford, or for that matter any ratepayer, and even all the ratepayers collectively, are not eligible technically to be admitted as a 'party' to an administrative agency proceeding under the Uniform Administrative Procedure Act."

Furthermore, although we thank the dissent for endeavoring to enlighten us as to the proper role of this court, we believe that it would be both improper and imprudent for us to attempt to address these questions. It would be improper because, having decided that Hartford lacked standing to appeal the decision of the DPUC, we do not have jurisdiction to consider the remainder of the issues implicated by its appeal. " 'Once it becomes clear that the trial court lacked subject matter jurisdiction to hear the plaintiffs' complaint, any further discussion of the merits is pure dicta. Lacking jurisdiction, neither the trial court nor this court should deliver an advisory opinion on matters entirely beyond our power to adjudicate.' *Doe* v. *Heintz*, 204 Conn. 17, 38, 526 A.2d 1318 (1987) (*Peters, C. J.*, concurring)." *Statewide Grievance Committee* v. *Rozbicki*, 211 Conn. 232, 246, 558 A.2d 986 (1989); see *SSM Associates Ltd. Partnership* v. *Plan & Zoning Commission*, 211 Conn. 331, 338, 559 A.2d 196 (1989). Also, it would be imprudent for us to reach these issues in this case because the parties briefed only the question of whether the phrase "was or ought to have been made a party" in § 16-35 requires an appellant to show that it was or should have been named a "party" to the proceedings at the DPUC from which it seeks to appeal.

[1] General Statutes § 16-35 provides that "[a]ny company, town, city, borough, corporation or person aggrieved by any order, authorization or decision of the department of public utility control, except an order, authorization or decision of the department approving the taking of land, in any matter to which he or it was or ought to have been made a party, may appeal therefrom in accordance with the provisions of section 4-183. The party so appealing shall give bond to the state, with sufficient surety, for the benefit of the adverse party, in such sum as the department fixes, to pay all costs in case he or it fails to sustain such appeal."

What makes this case particularly troubling is that Hartford sought in its appeal not only relief for itself as a ratepayer from substantial rate increases of $141 million granted to CL&P over a three year period, but also sought to protect the interests of its inhabitants who depend upon electric power. For Hartford, electricity is a major item in the city's budget, with over $1.5 million spent on street lighting in the 1991–92 fiscal year. Decisions regarding this modern necessity of life, for which the state grants CL&P a monopoly, must be subject to judicial review when challenged, and in that judicial review the voice of Hartford must be heard. Such rate increases, as Hartford alleged in its petition to intervene before the DPUC, will "seriously jeopardize the ability of the city of Hartford as a consumer of electricity, and of its inhabitants as electricity consumers, to continue to meet existing financial burdens and economic necessities."

Hartford's deputy city manager, Patricia M. Williams, testified before the DPUC that Hartford is the fourth poorest city in the United States, is ranked the highest in Connecticut for the number of persons living below the poverty level in the state, and is the second highest nationally for poverty among children. These statistics and dire underlying concerns make it essential that the low income residents of the city have a voice through Hartford in the appeal.

In response to the city's severe poverty, one of Hartford's proposals before the DPUC was the initiation of a "life line" rate which would give low income residents a discount for electricity, but still cover the operating costs of CL&P. Indeed, Hartford, CL&P and others who participated in the hearings before the DPUC agreed to a partial settlement which provided for discounts for low income ratepayers and increased funding for energy conservation programs. For rea-

sons that are not disclosed in the record, the DPUC rejected this partial settlement agreement.

In their amici brief, the Conservation Law Foundation and the Connecticut Fund for the Environment, Inc., indicate that "a narrow interpretation of standing would limit the ability of all but public service companies and state agencies to appeal from decisions of the DPUC." The amici brief further highlights that only through active participation by ratepayers in rate setting proceedings can public service monopolies be kept to their statutory mandate of "just, reasonable and adequate" rates. General Statutes § 16-19a. Participation, however, will not be active if the ratepayers are prohibited from appealing adverse decisions. Indeed, both the office of consumer counsel of the DPUC and the Connecticut Conference of Municipalities argued forcefully that because Hartford has actively participated in the proceedings and was legally aggrieved by the DPUC's decision, the city is entitled to appeal.

In this case, the majority dismisses the broader meaning of "party" and employs the narrow technical definition of the term, requiring formal party status, when construing § 16-35. Presumably, the majority implicitly holds that to be a "party" for a right to appeal under § 16-35, the person or entity must comply with the rigorous statutory definition of "party" set forth in General Statutes § 4-177a (a)[2] of the Uniform Admin-

[2] General Statutes § 4-177a provides in relevant part: "(a) The presiding officer shall grant a person status as *a party* in a contested case if that officer finds that: (1) Such person has submitted a written petition to the agency and mailed copies to all parties, at least five days before the date of hearing; and (2) the petition states facts that demonstrate that the petitioner's legal rights, duties or privileges shall be specifically affected by the agency's decision in the contested case.

"(b) The presiding officer may grant any person status as *an intervenor* in a contested case if that officer finds that: (1) Such person has submitted a written petition to the agency and mailed copies to all parties, at least 5 days before the date of hearing; and (2) the petition states facts that demonstrate that the petitioner's participation is in the interests of justice and will not impair the orderly conduct of the proceedings." (Emphasis added.)

istrative Procedure Act.[3] General Statutes §§ 4-166 through 4-189. Consequently, the majority affirms the trial court's dismissal of Hartford's appeal because the city, pursuant to § 4-177a (b), participated in the DPUC's administrative hearing as an "intervenor." Hartford, however, argues that it is entitled to appeal under § 16-35 because "party" includes intervenors who appear before the DPUC.

A review of the legislative history reveals that the relevant language of § 16-35 first appeared in chapter 128 of the 1911 Public Acts, while § 4-177a was only

---

[3] The majority asserts, in footnote 23 of its opinion, that it does not define "party" in terms of § 4-177a (a), yet the majority does not specifically inform us what does constitute a "party" within the meaning of § 16-35. Rather, the majority states merely that Hartford was not a party in this instance. If "party," as used in § 16-35, is not given its ordinary meaning as stated in *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 227, 602 A.2d 1019 (1992)—" 'a person concerned or having or taking part in any affair, matter, transaction, or proceeding . . .' "—the definition of "party" under § 4-177a (a) of the Uniform Administrative Procedure Act would then logically control. If the majority believes that an ordinary ratepayer would satisfy the requirements of a "party" under § 4-177a (a), or that there may be some third definition of "party" under § 16-35, it seems to me that the majority has an obligation to disclose its reasoning or its understanding of what "party" might otherwise mean. As an appellate court, we write opinions not only for the benefit of deciding a case and for the parties before us, but also to furnish guidance to the trial court for future cases. Furthermore, in a case such as this, we do so to furnish notice to the legislature of the interpretation that we have placed on a statute that is *in issue* before us, so that if the legislature disagrees with our interpretation, that branch of government can take corrective action. The issue of how to interpret "party" under § 16-35 is clearly before us. The majority does a disservice to the trial court, to future litigants and to the legislature when it refuses to explain what it understands that word to mean.

The majority claims that we do not have subject matter jurisdiction to do this. If the majority has jurisdiction to decide who is *not* a party, and the majority has jurisdiction to write a voluminous opinion on the subject, surely it would not offend our subject matter jurisdiction for the majority to define "party" for the purpose of determining whether we have jurisdiction. A court always "has authority to determine its own authority, or as it is sometimes put, 'jurisdiction to determine its jurisdiction.' " 1 Restatement (Second), Judgments § 11, comment (c), p. 110 (1980).

recently enacted in 1988. Thus, the legislators who enacted § 16-35 could not have intended to define "party" in terms of the specific and restrictive definition of § 4-177a (a). Moreover, the 1911 legislators could not have intended to distinguish between a "party" and an "intervenor," which are terms of art in modern administrative law. Consequently, the term "party" was utilized in § 16-35 in its general sense, to encompass any individual or entity who participates in an administrative hearing before the DPUC, including those individuals who participated as "intervenors."[4]

The technical definition of "party," set forth in § 4-177a (a), is extremely constrictive. Hartford, or for that matter any ratepayer, and even all the ratepayers collectively, are not eligible technically to be admitted as a "party" to an administrative agency proceeding under the Uniform Administrative Procedure Act. This standard is more rigorous than the aggrievement standard which merely requires that a ratepayer have a "specific personal and legal *interest* in the subject matter of the decision." (Emphasis added; internal quotation marks omitted.) *Light Rigging Co.* v. *Dept. of Public Utility Control,* 219 Conn. 168, 173, 592 A.2d 386 (1991). Adherence to such a technically rigid standard would be counter to the promotion of full, active participation in the process of rate setting and the protection of the public.

---

[4] In *New Haven* v. *Public Utilities Commission,* 165 Conn. 687, 345 A.2d 563 (1974), this court allowed the city of New Haven to take an appeal from an adverse decision of the public utilities commission, the predecessor to the DPUC, although the city was not a formal "party" in that action. It is true, as the majority points out, that the meaning of "party" status apparently had not "been raised by the parties or otherwise brought to the attention of the court in that case." Nevertheless, it is ironic that in this case the majority effectively deprives Hartford access to the courts, yet in *New Haven* this court never questioned the city's right to appeal. Furthermore, although § 16-35 was first enacted more than eighty years ago, in 1911, the majority is unable to cite a single case in which an entity that had actively participated in proceedings before the public utilities commission or the DPUC was *not* considered a "party" for appeal purposes.

Not only does the majority's narrow interpretation of the term "party" stand in direct opposition to our recent interpretation of the term in *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 602 A.2d 1019 (1992), but it also ignores the legislature's apparent intent to allow the voices of rate-paying consumers to be effectively heard. Additionally, the majority disregards the harsh public policy implications of its narrow interpretation.

Just three years ago, this court interpreted the term "party" as it is used in General Statutes § 1-21i (d).[5] Id., 217. In *Rose*, we held that the use of the term "party" by the legislature did not require formal party status under § 4-177a in a freedom of information commission (FOIC) proceeding as a prerequisite for standing to appeal a decision of the commission that aggrieved the appellant. Id., 229. Rather, we construed "party" broadly to mean " '[a] person concerned or having or taking part in any affair, matter, transaction, or proceeding . . . .' " Id., 227, quoting Black's Law Dictionary. Under this definition of "party," Hartford, which participated as an intervenor before the DPUC, would certainly qualify to appeal under § 16-35.

Today the majority performs linguistic gymnastics in an effort to distinguish *Rose* from the facts before us. The language of the statute at issue in *Rose*, § 1-21i (d), and the language of statute at issue in this case, § 16-35, are practically identical. The majority distinguishes the respective language by highlighting the phrase, "made a party" which is present in § 16-35.[6]

[5] General Statutes § 1-21i (d) provides in relevant part: "Any party aggrieved by the decision of [the freedom of information commission] may appeal therefrom . . . ."

[6] In defense of its constrictive interpretation, the majority also points out that the legislature amended § 1-21i (d) in 1977 as evidence of legislative intent that "party" be interpreted broadly only in that context. This

They assert that the use of the word "made" in § 16-35 "denotes the act of seeking and attaining actual party status." If "party" is given its broad definition under § 16-35 as we gave it in *Rose*, then Hartford was "made a party" before the DPUC when it was allowed to participate as an intervenor. This is the same result we reached in *Rose*. In *Rose*, the plaintiffs were intervenors before the FOIC and were deemed "parties" for the purposes of appeal. *Rose* v. *Freedom of Information Commission*, supra, 221 Conn 221. Therefore, any distinction that may exist between deeming someone a party and "making" someone a party is insufficient to deny Hartford the more expansive interpretation of "party" we articulated in *Rose*.

As we noted in *Rose*, the technical use of a term is not to be employed when to do so may lead to "unacceptable results." Id., 226. Unless the language is "absolutely clear," a statutory term should be construed in a way that "give[s] effect to the intended purpose of the legislature." (Internal quotation marks omitted.) Id., 225. In this instance, to construe "party" in the technical sense leads to the unacceptable result of ignoring the intervening status of Hartford in the DPUC's proceeding and Hartford's advocacy for its low income inhabitants.

Construing "party" technically in § 16-35 for a contested case flies in the face of the legislature's intent

legislative history, however, can equally support employing the broader construction of "party" in this case. The legislature altered § 1-21i (d) from "[a]ny *person* aggrieved" to "[a]ny *party* aggrieved" so that state agencies would be able to appeal. (Emphasis added.) *Rose* v. *Freedom of Information Commission*, supra, 221 Conn. 227–28. Thus, rather than add "state agency" to the statutory definition of "person" (General Statutes § 1-18 [a]), or change the statute to read, "[a]ny person or state agency aggrieved," the legislature chose to replace "person" with "party." Therefore, it appears to be the legislature's understanding that "party" is a more expansive term than "person," thereby evidencing the legislative intent that the term encompass more than just individuals who have obtained formal party status.

to treat ratepayers the same as the public services company. This legislative intent is demonstrated by General Statutes § 16-19pp, which provides that the DPUC "shall not hold an uncontested proceeding on any issue affecting ratepayers of the state unless such proceeding provides ratepayers with equal status and the same rights of participation as that of a public service company." Thus, § 16-19pp demonstrates a clear legislative intent that the regulator and the monopolistic public service company are not to ignore the consumer.[7]

Beyond our holding in *Rose,* and beyond the legislative intent to allow ratepayers an opportunity to have their voices judicially heard, public policy requires that "party" in § 16-35 be defined to include "intervenors." Despite the foreboding predictions of CL&P, the inclusion of intervenors in the definition of "party" will not open the floodgates of litigation. "Intervenor" status in a "contested case" is not granted to just anyone. Rather, to be an intervenor, a person, upon submitting a timely petition, must state "facts that demonstrate that the petitioner's participation is in the interests of justice and will not impair the orderly conduct of the proceedings." General Statutes § 4-177a (b). This standard adequately separates those ratepayers who have claims meriting the right to participate and appeal individually, from those who have general concerns that can be raised and appealed by the office of consumer counsel.

---

[7] This intent is also reflected in the legislative history of § 16-19pp. Prior to enacting the statute, Senator Gary A. Hale commented that "the Department of Public Utility Control shall not hold an uncontested proceeding into any issue affecting ratepayers without a notice of intent to the public so that ratepayers themselves will have the ability *to be a party* in the proceedings." (Emphasis added.) 35 S. Proc., Pt. 3, 1992 Sess., p. 1040. Not only does this statement indicate the legislative intent to empower ratepayers to participate in DPUC proceedings, but this statement also serves to illustrate how the legislature liberally uses the term "party."

As this court has stated, "[s]tanding is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Light Rigging Co.* v. *Dept. of Public Utility Control*, supra, 219 Conn. 172. In this case, Hartford has actively participated in the proceeding and now suffers from an adverse decision of the DPUC. Unquestionably, there is a "hot controversy" to be decided on appeal. Therefore, rather than impose a constrictive, technical standard that will preclude virtually all ratepayers from appeal, regardless of their aggrievement, this court should recognize that those individuals or entities that have participated actively in the DPUC's proceeding as intervenors have standing to appeal an adverse decision as a "party" under § 16-35. Accordingly, this court should go on to address the issue of whether Hartford was aggrieved.

Finally, even on the basis of the majority's analysis, at the very least, procedural fairness requires that we not merely affirm the dismissal of Hartford's appeal. Rather, the matter should be remanded to the trial court to determine whether Hartford "ought to have been made a party" as provided in § 16-35. Cf. *Mannweiler* v. *LaFlamme*, 232 Conn. 27, 36, 653 A.2d 168 (1995).[8] In doing so, despite the majority's refusal, we should clearly define "party" under § 16-35.[9]

---

[8] Just as the record can be corrected by furnishing proper notice to achieve subject matter jurisdiction in an action for a declaratory judgment; see *Mannweiler* v. *LaFlamme*, supra, 232 Conn. 36; so, too, should Hartford be allowed in this case to establish a record in the trial court on the issue of whether it "ought to have been made a party" under § 16-35.

[9] See footnote 3 of this dissent.

The majority, however, claims that Hartford "neither pleaded nor established at the trial level that it should have been made an actual party to the proceedings." Nevertheless, Hartford should not be deprived of the opportunity to do so for two compelling reasons. First, CL&P conceded at oral argument that Hartford had requested "party" status, but was denied such by the DPUC. For some reason, however, the majority ignores this concession. Second, the issue of whether Hartford had a right to appeal under § 16-35 was raised for the first time by CL&P in its brief and was never raised before the trial court. The sole issue before the trial court, and the issue which dominated oral arguments before this court, was whether Hartford was aggrieved, not whether Hartford is a "party" under § 16-35. The majority, realizing that Hartford was sufficiently aggrieved under *Light Rigging Co.* v. *Dept. of Public Utility Control*, supra, 219 Conn. 168,[10] now switches its focus, and bases its decision on a claim that was never made at trial.

Accordingly, I respectfully dissent.

---

[10] This court concluded that the city of New Haven was aggrieved and could take an appeal in *New Haven* v. *Public Utilities Commission*, 165 Conn. 687, 345 A.2d 563 (1974). That case involved an attempt by the United Illuminating Company to run high voltage power lines through the city of New Haven. Id., 690. The trial court had found "that the city of New Haven, as a municipal body, has a substantial interest in the matter of construction of facilities by public service companies within its corporate limits." Id., 699. We refused to overturn the trial court's conclusion as contrary to law. Id., 704. Under this same rationale, Hartford must be deemed aggrieved in this case. If a municipality has a sufficient interest in its corporate limits to demonstrate aggrievement, certainly a municipality that itself spends more than $1.5 million annually on electricity for street lighting, and the inhabitants of which will bear a substantial share of any increase in electricity rates, similarly is aggrieved for the purpose of taking an appeal from the DPUC.